[No. 2309. Decided January 5, 1897.]

CITY OF TACOMA, *Respondent*, v. THE TACOMA LIGHT AND WATER COMPANY, *Appellant*.

APPEAL — ABSTRACT OF EVIDENCE — ASSIGNMENT OF ERROR BY RE-
SPONDENT — CONTRACT OF CITY — FRAUD — MISREPRESENTATIONS —
EVIDENCE — NEW TRIAL.

An abstract of evidence, exhibits, record and proceedings, prepared and printed by an appellant for the use of the court on appeal, is no part of the record, and is not authorized by statute or rules of court and should be stricken from the files on motion therefor.

In the absence of a cross-appeal, only the errors complained of by the appellant can be considered, and the court will not examine the record for the purpose of determining alleged errors or rulings of which the respondent complains.

The contract of a municipal corporation is governed by the same rules as that of a private individual, where the contract is within the scope of the power and authority conferred by law on the corporation, subject only to the limitation that a person dealing with municipal officers is conclusively presumed to know the extent of the power and authority which the law has conferred upon the officer with whom he deals, and is also presumed to know that the law exacts and requires of such officer the utmost good faith and loyalty to such municipality.

Persons who deal with public corporations through the proper officers, and who observe good faith and make use of no unlawful means or corrupt practices, are not accountable for a failure or neglect of such officers to discharge their duties to the corporations whom they serve, but, in such cases, the corporation must look to its own officers and not to the parties dealing with them.

A false representation, to be actionable, must be made with the intention that it should be acted upon by the party to whom it is made, and it must be made under such circumstances as would justify a reasonably prudent man in relying upon it; and, generally, where the means of knowledge is at hand and accessible, if the purchaser does not avail himself of these means, he cannot be heard to complain in a court of law, that he was deceived by the seller's misrepresentations.

While the issue of fraud may be sustained by circumstantial evidence, as well as by direct and positive proof, it cannot be established by strained inferences from circumstances that may reasonably consist with an honest intent as well as with an intent to defraud.

Fraud cannot be predicated upon a representation which does not relate to a past transaction nor contain a statement of an existing fact, but is a mere estimate or representation of what the one charged with fraud proposed to do in the future.

Where the trial judge is not satisfied with the verdict, and is of the opinion that it is not supported by the evidence or is against the weight of evidence, it is his duty to set it aside, even though there may be some conflict in the testimony.

Appeal from Superior Court, Pierce County.— Hon. W. H. PRITCHARD, Judge.   Reversed.

*Parsons, Corell & Parsons,* and *Crowley, Sullivan & Grosscup (J. H. Mitchell,* of counsel), for appellant.

*James Wickersham,* for respondent.

The opinion of the court was delivered by

GORDON, J.—This action was brought by the respondent city to recover damages for deceit and misrepresentation of the appellant in the sale of a water and light plant, the purchase price of which was $1,750,000. The jury found for the respondent in the sum of $787,500, and from the judgment entered upon this verdict and the order of the superior court denying a motion for a new trial, an appeal has been taken. Fraud is relied upon as the basis of plaintiff's cause of action. It is not based upon anything contained in the contract—upon any covenant or warranty therein contained—but it goes beyond the contract, and sets up false representations in regard to the character, extent and value of the property sold, and further alleges that the appellant fraudulently and corruptly induced and employed the officers of the city and the president of the city council to forego any investigation or examination of the character, condition and value of the property purchased; that by reason of such corrupt inducement and employment the respondent was prevented from "making any investigation and examination of the sources of water supply, of the value, character and extent of the said property so purchased from defendant." Damages were laid in the complaint at $1,000,000.

The answer was a general denial of the allegations of misrepresentation and fraud, and alleged that the city by its proper officers and agents made a full examination of the property embraced within the purchase and for the purpose of fully ascertaining the character, condition and value thereof, employed one Rudolph Hering, a competent and experienced civil and hydraulic engineer, and that said Hering made a

full report thereon to the city council, and that the members of the council had full opportunity at all times to make such examination and inspection of the property and everything connected with it as fully as they or any one of them might desire; alleges that the city purchased the property sold to it by appellant, relying upon the knowledge of its officers, agents and engineers employed by it to make an examination thereof, and not in reliance upon any statement or representation of any kind made by the appellant to respondent.

In its reply the city admits that it employed the said Hering and that he made some examination of the property, and "that he made a report thereof to the city council, and alleges that he relied entirely upon the representations concerning all matters in the said report, made to him by the defendant, its agents, servants and employees, and *that he made no other examination,* but denies that the report contained full information of the kind, character and situation of the property, including the sources of water supply, . . . and denies that plaintiff purchased the property relying upon the knowledge of its officers, agents, employees and engineers employed by it to make an examination thereof."

A preliminary question is presented by the motion of respondent's counsel to strike a so-called "Abstract of Evidence, Exhibits," etc., being a printed book containing something over 500 pages, which the appellant has filed in this court. The so-called "abstract" was prepared for the purpose of facilitating the labors of the court and with a view to condensing the record, but the motion must prevail for the reason that it is no part of the record and has no place in the proceedings under the statute and rules of this court.

The lower court, in submitting the case to the jury, restricted their consideration of it in so far as misrepresentation is charged to four specific questions of fact, and withdrew all others from their consideration. Those submitted were:

"1. Whether, before the sale, defendant made any representations to plaintiff relative to the quantity of water actually flowing from Thomas and Patterson springs.

"2. As to the quantity of iron pipe *then laid.*

"3. As to the quantity of land at station 'A.'

"4. As to the value of the property sold."

The court also submitted the question of whether "the defendant and the president of the city council of the city of Tacoma entered into collusion for the purpose of defrauding the city, and whether the defendant procured the said president of the council to act for and on its behalf instead of on behalf of the city, as his official duty required." The court further charged:

"I instruct you, that all other alleged misrepresentations charged in the complaint are withdrawn from your consideration, and that if the plaintiff recover at all it must be on the ground of *misrepresentations* in these, or in some one of these, respects."

Counsel for the city, in his elaborate and exhaustive brief, has presented the case in all respects as if the consideration of the jury had not been so restricted, and he has also treated certain offers of evidence made and rejected upon the trial as if the proof had actually been made and received. We have frequently held that upon appeal from a judgment in a particular case this court can only consider errors complained of by the appellant, and, in the absence of a cross-appeal, cannot examine the record for the purpose of determining alleged errors or rulings of which the respon-

dent complains.    *Glenn v. Hill,* 11 Wash. 542 (40 Pac.
141); *Langert v. David,* 14 Wash. 389 (44 Pac. 875);
*Pepperall v. City Park Transit Co.,* 15 Wash. 176 (45
Pac. 743).

A great many errors have been assigned in the brief
of counsel for the appellant, but the conclusion which
we have reached regarding two of them renders it un-
important that the others complained of should be
considered.   At the conclusion of the evidence on the
trial below, the appellant moved for a non-suit upon
the ground that the plaintiff had failed to prove a suf-
ficient cause for the jury.   It also moved for a new
trial, which motion was based upon various grounds,
and among others, " insufficiency of the evidence to
justify the verdict."   The ruling of the lower court
denying the motion for non-suit, and the subsequent
overruling of the motion for a new trial, present a
single question.

Before proceeding to a discussion of the evidence,
we may here observe that a municipal corporation has
a right to rely on the good faith and loyalty of its
officers; that such officers owe to their municipalities
the utmost degree of good faith, and that it is their
duty at all times to use their best judgment in protect-
ing the interests of the municipalities whose officers
they are, and a person dealing with such officers is
conclusively presumed to know the extent of the power
and authority which the law has conferred upon the
officer with whom he deals, and is also presumed to
know that the law exacts and requires of such officer
the utmost good faith and loyalty to such municipality.
But, subject to the limitation above noticed, the rule
applicable to the contracts of municipal corporations
is, we think, the same as that applicable to the con-
tracts of individuals; in other words, where the con-

tract entered into is within the scope and extent of the power and authority conferred by law on the officer, and no question of power or authority is involved, the rule applicable to that contract is the rule that is common to all contracts, and in an action by a municipal corporation founded upon fraud there can be no recovery unless the evidence to substantiate the fraud charged is, *under the general rules of law* as to the sufficiency of evidence, sufficient to support a verdict. The rule is thus stated in *Argenti v. City of San Francisco*, 16 Cal. 256:

"Contracts of corporations, whether public or private, stand on the same footing with the contracts of natural persons, and depend on the same circumstances for their validity and effect."

And in *Baird v. Mayor of New York*, 96 N. Y. 593, it is said:

"No different rule prevails in respect to the contracts of corporations than that applicable to the contracts of private individuals, and we must determine the rights involved in this action by the light of the same principles which experience has shown to be salutary in other cases."

The cases of *People v. Fields*, 58 N. Y. 491, and *Hume v. United States*, 132 U. S. 406 (10 Sup. Ct. 134), cited and most strongly relied upon by respondent's counsel, are not in conflict with the rule above stated. In the first of these cases the act of the comptroller of the city of New York which was pleaded as a payment, etc., was held by the court to be an act *beyond the power* of that officer. The court say:

"The payment was made and received without any lawful power in the comptroller to make it. The defendant is chargeable with knowledge of this. It was a payment by an agent, who had no authority, as such, to make it."

In *Hume v. United States, supra,* the court was dealing with a contract which it decided that no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept on the other; and the principles governing that case and those involved in the case at bar are not analogous.  Nor was there anything decided in *Tacoma Light & Water Co. v. Tacoma,* 13 Wash. 115 (42 Pac. 533), which militates against the view herein expressed.  The language made use of in that case, and which is cited by counsel, viz.,

" The appellant knew that it was dealing with a municipal corporation, and was bound to know that a different rule obtains in such cases from that which would obtain were it between individuals, and to know that the city officers and council could only make the purchase as authorized by the electors of the city, and that they could not bind the city by agreeing to take any less property, or any other property, than that which was embraced within the terms of the ordinance as submitted and passed upon,"

relates to the *power of the officers to bind the city beyond the general scope of their authority,* and was not intended to, and does not, decide that " a different rule obtains " in the case of an *authorized contract* made by the officers of the city and a contract made by an individual.  Of course, if one who deals with such an officer colludes with him and thereby procures him to violate his duty, such action becomes a fraud upon the corporation, but, on the other hand, persons who deal with such public corporations through the proper officers and who observe good faith and make use of no unlawful means or corrupt practices, are not accountable for a failure or neglect of such officers to discharge their duties to the corporations whom they serve, but in such case, the city or other municipal

corporation must look to its own officers, and not to the parties so dealing with them. In this case the appellant had a right to fix its own price upon its property and was not obliged to sell it for less than the price it saw fit to place upon it. A representation, to be actionable, must be made with the intention that it should be acted upon by the party to whom it is made, and it must be made under such circumstances as would justify a reasonably prudent man in relying upon it, and, generally speaking, where the means of knowledge is at hand and accessible, if the purchaser does not avail himself of these means, he cannot be heard to complain in a court of law that he was deceived by the seller's misrepresentations, or, as was said in *Washington Central Imp. Co. v. Newlands*, 11 Wash. 214 (39 Pac. 367) :

" Parties must exercise ordinary business sense, and the faculties which are given to them for the purpose of transacting business; and that they cannot call upon the law to stand *in loco parentis* to them in the ordinary transactions of business and their ordinary dealings with their fellow men. . . . If people having eyes refuse to open them and look, and having understanding refuse to exercise it, they must not complain, when they accept and act upon the representations of other people, if their venture does not prove successful. Written contracts would become too unstable if courts were to annul them on representations of this kind."

So far as the facts in this case are concerned there is little dispute and few contradictions.

In disposing of the objection that the verdict and judgment are against the evidence, we recognize the rule to be that if the verdict has any *substantial* evidence in its support, it ought not to be set aside for the reason merely that in the opinion of the appellate

court there was a greater amount of evidence on the other side.   *Dillon v. Folsom,* 5 Wash. 439 (32 Pac. 216).

" But we do not understand the law to be that a verdict should be set aside only in those cases where there is no testimony whatever to sustain it.   .   .   . If, on due consideration of the evidence, it appears that the verdict is not supported *by any substantial proofs,* it ought to be promptly and unhesitatingly set aside, and a new trial ordered."   *Pederson v. Seattle, etc., Street Ry. Co.,* 6 Wash. 206 (33 Pac. 351); *Guley v. Northwestern Coal, etc., Co.,* 7 Wash. 491 (35 Pac. 372); *Comegys v. American Lumber Co.,* 8 Wash. 661 (36 Pac. 1087); *Furth v. Snell,* 6 Wash. 542 (33 Pac. 830).

Where an issue of fraud is involved in any case, direct and positive proof is not required to sustain it, but circumstances from which the inference of fraud is *natural* and *irresistible* need only be shown.   *Millar & Co. v. Plass,* 11 Wash. 237 (39 Pac. 956).   But, while the issue of fraud may be sustained by circumstantial as well as by direct and positive proof, it cannot be established by *strained inferences,* or rest upon conjecture merely.

" Fraud will not be presumed, and must be established by proof either direct or circumstantial.   If by the latter, the circumstances relied upon must be such as to reasonably consist only with the intent to defraud, and to be in some degree inconsistent with an honest intent."   *Roberts v. Washington National Bank,* 11 Wash. 559 (40 Pac. 225).

The court of appeals of New York in *Baird v. Mayor of New York,* 96 N. Y. 593, say:

" In the case of *Kingsley v. City of Brooklyn* (78 N. Y. 215), it was said by Judge MILLER :   ' Allegations of fraud against public officials, without proof of facts establishing their guilt, are of but little avail in avoid-

ing a contract in a court of law.   To set aside a contract on any such ground, and to justify a court in holding, as matter of law, that it is void, the proof should be explicit, clear and conclusive.'   It was said by Judge FINCH, in the case of *Schultz v. Hoagland et al.* (85 N. Y. 467) : ' . . . It is seldom, however, that it can be directly proved, and usually is deducted from other facts which naturally and logically indicate its existence.   Such facts, nevertheless, must be of a character to warrant the inference.   It is not enough that they are ambiguous and just as consistent with innocence as with guilt.   That would substitute suspicion as the equivalent of proof.' "

As already noticed, the court restricted the consideration of the jury to four questions of alleged misrepresentation, namely, the quantity of water actually flowing from Thomas and Patterson springs, the quantity of pipe then laid, the quantity of land at station A, and the value of the property sold.   As to the first of these, it is the contention of the city that for the purpose of inducing the plaintiff to purchase the property at the price named, the appellant, by its officers, servants and employees falsely and fraudulently represented to the plaintiff (city), its agents and officers, that the permanent daily flow of water from Thomas and Patterson springs was not less than 10,000,000 gallons.   These springs were one of the sources of supply on the line of projected extension of the water system, and it was expected by the city that by reason of their location the water from these springs would be sufficient to supply by gravity the upper or higher service of the city — being the most elevated portions of the city.

As to the second question submitted, it is the contention of the city that the appellant represented to its officers and engineers that the city was to receive

66.14 miles of pipe in the distributing system, whereas in truth and in fact, the city only received 53½ miles, making a loss of 12½ miles of pipe laid.

As to the third question submitted, it is the contention of the city that the quantity of land at station "A" was represented to the officers of the city as containing 8.16 acres, whereas, in truth and in fact, the quantity of land actually received was .816 of an acre.

The remaining question relates to representations concerning the value of the property, and can be more appropriately considered in connection with the charge of bribery and corruption of the president of the city council. The record discloses that as early as the year 1891 the question of the advisability of the city's owning its own water plant was a subject of discussion, both through the columns of the daily press of the city and otherwise. The sentiment apparently gained favor with the people, so much so that at the spring election in the city for the year 1892 (at which time Harris A. Corell was elected to the council), it was incorporated in the platform of the political party and made an issue during the campaign. Mr. Corell became president of the council and was the officer and agent of the city, whom, it is alleged, was bribed and corrupted in office by the appellant. Prior to the time of such election, a committee of citizens had been appointed under the preceding city administration for the purpose of examining and reporting to the council upon the practicability and feasibility of the city's constructing and operating an independent system, and a great deal of time and some considerable money had been expended in that connection. Some time during the spring or summer of 1892 the council of the city entered into negotiations with the appellant concerning the purchase of the plant in question.

After receiving from it a schedule or list of its property purporting to show the character, condition and extent of its plant, the council authorized its fire and water committee (to whom it had entrusted the detail involved in the transaction) to employ a competent hydraulic engineer for the purpose of making an examination of the water plant and system then owned by the appellant and to report the result of such examination to the council, also to report as to the advisability of the city's purchasing said waterworks. or of constructing an independent system to be owned and operated by the city. In accordance with the authority conferred by the council, Rudolph Hering was employed as such engineer. In this connection it may be said that Mr. Hering is conceded by counsel to be an expert hydraulic engineer, who stands at the head of his profession in the United States, and there is nothing in the record tending to throw discredit or suspicion upon his work, or the manner in which he discharged his duties. Mr. Hering arrived in Tacoma early in September, 1892, and proceeded at once to an examination of the appellant's plant and water works, and otherwise to discharge the service for which he had been employed. Having completed such examination he reported to the mayor and council of the city on the 22d of October, 1892. Five hundred copies of this report were ordered and directed to be printed by the council. The report comprises about forty printed pages, and treats exhaustively of the entire subject, including the condition, character, extent and value of the system of water works then owned and operated by the appellant company. In said report he estimates the daily capacity of the different springs and other sources of supply. His estimate of the daily capacity of Thomas spring is placed

at 5,000,000 gallons.   He states that this estimate is
based on " careful gauging, and in part upon an esti-
mate made by Mr. George H. Sellers, chief engineer
of the light and water company, and *substantially veri-
fied by me during the low flow of the present year.*"   Of
Patterson spring the report says:  " From a careful
study I have concluded that it will be safe to estimate
upon a yield of 5,000,000 gallons from the Patterson
spring," etc.   The deposition of Mr. Hering was taken
and this report was made a part of his deposition.   In
this connection, we should say that Thomas and Pat-
terson springs were not at that time a part of the sys-
tem as then in operation, but were available sources
of supply along the line of a projected extension.   In
answer to a question propounded by respondent's
counsel, Mr. Hering stated that he " made a personal
examination of the plant so far as it was exposed to
view on the surface; " that he " did not rely upon any
statements made " to him by any officers or agents of
the appellant company where he '' had means of veri-
fying them," but did rely to some extent on statements
made to him by Hosmer, Hill and Sellers (officers of
the appellant company), " in making up estimates of
actual disbursements for the cost of different parts of
the work, where *they were under ground or not accessi-
ble.*"   Being asked whether, in making his examina-
tion, he was influenced by any representations of the
appellant, or caused thereby to exercise a greater or
less degree of care than he otherwise would have done,
he answered, " I was not influenced by any such rep-
resentations to modify my conclusions which the ob-
served fact and the investigation of the engineering
features indicated to me.   They *did not cause me to ex-
ercise* either a greater or a less degree of care than I
would have otherwise given the subject," and again,

"I did make such examinations as I believed were entirely sufficient and safe for the purpose of the advice I was employed to give." His attention being directed to the shortage claimed in the flow of these springs, he says, "I know of no reason at this time why I should change my recommendations made in my report. The assertion that Patterson springs, after gauging by the city officers, have not yielded the amount stated in my report . . . would not change my general recommendation. . . . *Having myself actually observed* approximately the quantities of flow as stated in my report and being aware that this flow represented practically a minimum, owing to the end of the just passed dry season, I should now suppose that much of the water then apparent had been lost by digging up the ground and breaking the impervious strata, which operation I saw in part going on at the time of my visit . . ." And again he says, "The character of Thomas and Patterson springs required for their utilization the direction and supervision of intelligent and experienced engineers. The water issued at the foot of a bluff in a formation consisting mainly of gravel, sand, or glacial drift; this material being quite porous and allowing water to percolate through it, such springs must be handled with great care to prevent a loss into the lower and porous strata."

We think that enough is here shown to defeat a recovery by the city upon the ground of misrepresentation in reference to the quantity of water flowing from these springs. The proof shows that instead of the officers of the city relying upon representations made by the appellant as to the quantity of water flowing from these springs, it employed an agent of its own for the purpose of determining that and other questions connected with the purchase. The agent of their

own selection was competent for that purpose; he was brought to the city of Tacoma for the express purpose of experting the proposition and ascertaining the facts in regard thereto. Having ascertained them, he made his report to the council. He shows in his report, and in his deposition, upon what his estimates were based. This proof was all a part of plaintiff's case, and there is no reason suggested why it should not be considered binding upon the city. Instead of tending to prove the case which plaintiff has stated in its pleading, it absolutely disproves it.

Among the witnesses called by the respondent in the trial below were various members of the council who took part in the proceedings which terminated in the passage of an ordinance on March 4, 1893, submitting the proposition of purchasing the plant in question at the price of $1,750,000 to the voters of the city. Without undertaking to give in detail their testimony upon this question, we are warranted in saying that it shows that they had read and carefully considered the report of their engineer and, in exercising their judgment and voting upon the different propositions coming before the council involving the purchase of the plant, they did so with full knowledge of what was contained in this report. Not only the allegation that plaintiff relied upon the representations of the defendant as to the quantity of water flowing from these springs is disproved by plaintiff's own evidence, but the same evidence disproves another theory of plaintiff's case, namely, that it (the city) was induced to forego an examination as to the character, condition, extent and value of the system by reason of defendant's corrupting and bribing the president of the city council, instead of the record showing that the officers of the city were employed or

induced to forego making an examination of the property involved in the purchase by reason of defendant's having corrupted and bribed them, it shows that they selected a competent, expert engineer who made such examination and full report, and this report was actually acted upon.

Considering next the second question submitted, namely, as to the quantity of iron pipe *then laid*, the record shows that Mr. Hering's report includes a table of lengths of pipe in the distributing system amounting in all to 66.14 miles, and it is contended that the proof shows that only 53½ miles of pipe were received.   The table so referred to shows the following:

"*Miles of pipe laid* —

To Jan. 1, 1891............................ 37.2
During the year 1891... ................. 3.5
To be laid in 1892..................~........ 25.4

Total miles........................... 66.1."

The proof further shows that the table accompanying this report was furnished to Mr. Hering by the officers of the company and it may be conceded that he placed reliance upon it in so far, at least, as it purported to contain a statement of the pipe actually laid, inasmuch as to that extent it could not well be verified, and as shown by his deposition he placed reliance upon the estimates made by the appellant, where the works were underground and not accessible.   But the proof in this case fails to disclose that the statement contained in the table as to the amount of pipe then actually laid was false.   What the proof does show, however, is that instead of the company laying 25.4 miles during the year 1892 as it had estimated in the table above referred to, that it would do, it in

fact laid only about 12½ miles up to the time of the delivery of the plant to the city, but this, we think, was not an actionable representation.    It did not relate to a *past transaction* nor was it the statement of an existing fact.    It was a mere estimate of what they would do in the future, and fraud cannot be predicated upon it.    *Perkins v. Lougee,* 6 Neb. 222; *Gage v. Lewis,* 68 Ill. 604; *Gordon v. Butler,* 105 U. S. 553; *Sawyer v. Prickett,* 19 Wall. 146.

In this connection we may say that it sufficiently and satisfactorily appears, and indeed is conceded by counsel for the respondent, that the water pipe involved in the controversy between these parties, reported in 13 Wash. 115, was the pipe embraced within the estimate contained in the table already referred to, and hence it appears that the city has actually received not only all that the appellant represented to have been theretofore laid, but all that it estimated it would thereafter lay during the year 1892.    However, as already observed, a statement or representation of the defendant as to what it would add to its system at some future time would not constitute an actionable representation.    Evidently the lower court took this view of it when it restricted the jury's consideration to the quantity of pipe "then laid," and we ought not to extend this discussion to a consideration of issues which were withdrawn from the jury.    As against the respondent, at·least, the rulings thereon constitute for the purpose of this appeal the law of the case.

We come next to consider the third question submitted, namely, as to the quantity of land at station "A."    The proof in this connection shows that in the schedule or list of the property connected with this plant which the appellant furnished to the city, it was represented that there were 8.16 acres of land as a part

of the plant, being a site for a pumping station "A," whereas in fact that land contained only .816 of an acre.     The exact description contained in the schedule is as follows:

"Site for pumping station 'A:'     In s. w. quarter of n. w. quarter of sec. 9, tp. 20, N. R. 3 E., 8.16 acres."

Some of the councilmen examined in behalf of respondent testified that they acted upon the belief that the tract contained 8.16 acres, and they estimated that the value of the land, supposing it to contain that much, would have been $39,000.     The contention of the appellant is that it never intended to represent that it owned 8.16 acres, but that the description in the schedule was due to a clerical error in inserting the decimal point after, instead of before, the figure 8, making it read 8.16 acres instead of .816 acres.     We are unable to discover any proof which tends in any degree to show any fraudulent intention on the part of the appellant in this connection.     Not only do we think the proof wholly fails to show any intention to represent that it was the owner of 8.16 acres at the point designated as station "A," but we also think that the respondent was not misled by the description actually appearing in the schedule.     This was one of the subjects embraced within the report of Mr. Hering. In that report the land is correctly stated at .816 acres. Not only that, but it further appears that the subject was actually discussed before the council prior to its acceptance of the deed from appellant to the property in question, and certain concessions were asked and obtained from the appellant by the respondent in lieu thereof.     This of itself would, we think, constitute a full and complete defense to a recovery upon the ground of shortage in the amount of land received,

did the evidence tend to show that the city had theretofore been misled by the statement in the schedule, for notwithstanding that this adjustment was reached after the vote had been taken by the electors of the city, we think it related to the matter of detail within the power of the council to adjust, and was not such a substantial part of the transaction as necessitated a re-submission to the voters. In either view, there was nothing in the evidence bearing upon this branch of the case which should have been submitted to the jury.

The question remaining to be considered is whether there was evidence sufficient to authorize the finding by the jury that the appellant colluded with Mr. Corell, the president of the council, or bribed or corrupted him. Mr. Corell was elected to the council in the spring of 1892, and became a member of that body on April 18 of that year. His term expired one year thereafter. The ordinance submitting the proposition of purchase to the voters of the city passed the council first on February 28, 1893. Later it was recalled, amended and repassed on March 4, 1893. The election held in pursuance thereof was on April 11, 1893, but the purchase was not consummated by deed or delivery of the property or payment of the consideration until some time in July following. Mr. Corell was elected to the council pledged to the proposition that the city should own and control its own water and light plant. As president of the council it devolved upon him to appoint the various committees of that body, and among others the fire and water committee, but it is not pretended that in appointing that committee he was influenced by improper motives; indeed, it is not pretended that he was brought under the influence of the defendant until about January,

1893, subsequent to which time there remained of his official term some three months only. As already observed, Mr. Hering had long prior thereto examined the property and made his report. In December, 1892, the fire and water committee rendered its report to the concil, which report among other things states :

" The committee has made long and careful investigations of the subjects referred to it, and heretofore has made reports as to the sources of water supply, etc., and it has conducted all of the preliminary investigations that the committee was authorized to make; and has received from the Tacoma Light and Water Company its ultimate offer to sell to the city of Tacoma its entire electric light plant, its entire water plant and sources of supply as per schedule hereto attached; which ultimate offer is the gross sum of $1,850,000; and

" Whereas, The option is one upon which this committee must decide on or before the 31st of December, 1892 (this being the ultimatum given by the Tacoma Light and Water Company), as to whether or not the said ultimate offer will be accepted by the city of Tacoma; and

" Whereas, This committee is not justified in rejecting such ultimatum without first submitting it to the entire council; and

" Whereas, Your committee regard the price named as considerably above what the committee would desire it to be, to wit : *About $350,000 above what the committee think it should be*, still, in view of all the circumstances, your committee consider that it would be for the best interests of the city to own its own water and light plants; therefore,

" Your committee on fire and water would recommend to the city council that the ultimate offer of the Tacoma Light and Water Company, of $1,850,000, be considered by the city council, and if accepted, be submitted to the people of the city at the earliest practicable moment for their decision."

This report is signed by the entire committee on fire and water, consisting of five members.

It appears from the evidence that there was a sub-committee of the fire and water committee (which sub-committee was composed of councilmen Snyder and Steinbach), to which committee was entrusted the duty of reporting upon the value of the different properties embraced within the plant. This sub-committee was not appointed by Corell. In its report this sub-committee found the total value to be $1,523,638.05. In his testimony, councilman Snyder says that they took the list of the property as furnished by the appellant, and "valued each piece separately as well as we could, as we were situated away from the property. We formed an opinion of what we knew of the land itself." He also testified :

"Mr. Steinbach had been in the real estate business, and I thought I knew something of the value of land, and I suppose that is why we got put onto this committee."

He further says, " We cooked the report," that is, made the value of the property appear as large as possible, but he explained that he was desirous of making the value so appear in view of the strong sentiment prevailing in favor of the purchase of the property and his belief that the appellant could not be induced to sell for the actual value. He expressly denied, and it is not seriously contended by respondent's counsel, that he was unduly influenced or corrupted or bribed in any manner by the appellant, and there is not a particle of proof in the record tending in any wise to show that he was acting in collusion with the appellant or any of its officers. On January 10, 1893, Mayor Huson and Mr. Corell, as ad-

visory committee, made a report to the council, from which we quote :

" While the price of the Light and Water Company's plant, namely, $1,850,000 is $350,000 above what the water committee has appraised it at, we as advisors of the water committee believe it is the best proposition for many reasons, several of which are submitted herewith."

The report then goes on to show the advantages of of the city purchasing the plant rather than constructing an independent system, which, from reports of previous committees, would cost as great or a greater sum than that required to purchase the plant in question, and leave the city to compete with a rival plant, etc., etc. The report further states that the offer of $1,850,000 is $350,000 more than *they* believe to be its actual value. Thereafter and prior to the final passage of the ordinance submitting the question to the voters of the city, various resolutions were offered in the city council to the effect that the council would not submit any proposition to the voters involving the expenditure, in one resolution, of a million and a quarter dollars, in another, of a million and a half, and many similar propositions, upon all of which Mr. Corell voted " No," and such action on his part is referred to as evidence tending to show that he was acting in disregard of his duty to his constituents, and in the interest of the appellant, but the record furnishes what we consider a full and sufficient explanation of these votes. Not only did Mr. Corell oppose these various propositions, but a large majority of the council also opposed them, and their reasons for so doing are in the record, and constitute a part of plaintiff's case. The explanation as furnished by them is that these resolutions were put forward from time to

time by members who were opposed to the whole
proposition; that they were not made in good faith, but
for the purpose of delaying and defeating the propo-
sition of the city owning and controlling its own
plant, which proposition a greater number of the
members of the council had been elected to support;
that they felt it was their duty to their constituents to
submit the proposition to the people during their
official term; that they further considered that the so-
called "ultimatum" of the appellant company was —
as it professed to be — a final and ultimate offer and
proposition, and that in view of the efforts which had
been made from time to time by the council to secure
a reduction, it was fruitless to submit these various
counter-propositions involved in the resolutions op-
posed by them.   In the light of all the correspondence
and of the entire record, we think the explanation
was full, complete and satisfactory, and that their
conduct in this regard does not justify any inference
that they or any of them were prompted by other
than honest and commendable motives.   Their acts
throughout the entire transaction, in so far as the
record shows, were consistent with the presumption of
honesty with which the law surrounds the action of
all men.   Subsequent to the reports already referred
to, a special committee was appointed by Mr. Corell
as president of the council, pursuant to the resolution
to that effect, for the purpose of further conferring
with the appellant with a view to securing a reduc-
tion in the price asked for the plant.   For this com-
mittee Mr. Corell named certain members of the
council who had been most active in opposing the
proposition to purchase at the price offered by the ap-
pellant.   As a result of the joint efforts of this last
named committee and others, the price asked by ap-

pellant was reduced from $1,850,000 to $1,800,00.
Thereafter a further resolution passed the council au-
thorizing the appointment of a committee of three to
go to Philadelphia and confer with Mr. C. B. Wright,
the principal owner of the plant, with a view to secur-
ing a still lower figure.    Upon this committee Mr.
Corell appointed the mover of the resolution, Mr.
Snyder, also Mr. Berry, chairman of the fire and
water committee, and upon motion of Mr. Snyder,
Mr. Corell as president of the council was named as
one of the committee.    Mr. Berry being unable to
serve, Corell on suggestion of the council appointed
Mr. Steinbach in his stead.    The record of the city
clerk, which was put in evidence by the respondent,
shows this to be the history of this latter committee,
and it is further supported by the testimony of Mr.
Snyder, and other witnesses for the plaintiff, and this
evidence is not overcome by the testimony of other
members of the council who sought to make it appear
that Mr. Corell had appointed himself, but who, when
confronted by the record and the testimony of the
other witnesses, would not contend as against the
record that their memory in that respect correctly
served them.    In the first place we think that plain-
tiff should not have been permitted to contradict the
record in the manner attempted by it; in the next
place we think it was concluded by the testimony of
Snyder and others who testified substantially that the
record was correct.    These witnesses were neither hos-
tile to the plaintiff nor is their good faith called in
question.

There was also proof that prior to the introduction
of the resolution providing for the appointment of this
last mentioned committee, Mr. Snyder, the mover of
it, suggested to the president of the council that he

[Snyder] would like to go on that committee; that Corell told him "that he [Corell] would have the forming of the committee and that he would appoint him [Snyder], and that he also desired to be one of the members, which was perfectly agreeable  .  .  . he being on the light and water committee and being president of the council, I thought he ought to go, and he had taken a great deal of interest in the matter." The circumstances here disclosed do not justify a suspicion, much less are they "circumstances from which the inference of fraud is natural and irresistible." *Millar & Co. v. Plass, supra; Pederson v. Seattle, etc., Ry. Co., supra; Roberts v. Washington National Bank, supra.*

This committee went to Philadelphia and as a result of their labors secured a still further reduction in the purchase price of $50,000, and thereupon they recommended submission to the people of the proposition to purchase at the price of $1,750,000, and the proposition was submitted, ten councilmen voting therefor and six against it.

The record also shows that when the ordinance under which the proposition was submitted to the voters was before the council, the question of securing an assistant to the city attorney, with whom he might confer in the preparation of the ordinance, etc., was discussed by the council and the names of various eminent counsel suggested as suitable assistants. Finally the matter culminated in appellant's agreeing to employ Judge Parsons to render such assistance. The record shows that at that time, and for some time prior and at all times subsequent, Mr. Corell was a member of the firm of Parsons & Corell. Subsequent to the purchase of the plant, namely, July, 1893, differences arose between the city and the appellant growing out of the sale, and different suits were insti-

tuted, two of which came to this court, and are re-
ported in 13 Wash. 115 and 124. In that litigation
the appellant was represented by the firm of Parsons
& Corell. ·As already noticed, that litigation was sub-
sequent to the final consummation of the purchase
and sale, and was long after Mr. Corell had retired
from the council. It further appears that for the serv-
ices of Mr. Parsons, and of Parsons & Corell, in that
litigation and in various other matters connected with
the sale, including the assistance rendered the city at-
torney already referred to, the firm of Parsons & Corell
was paid a lump sum, and it is urged that inasmuch
as Mr. Corell was at all times subsequent to the time
when ordinance No. 790 was introduced into the coun-
cil, namely, on January 10, 1893, a member of such
law firm, he was in the employ of the appellant, and
thereby disqualified from discharging his full duty to
the respondent city.   With this contention we cannot
agree, first, because it fully appears from the record
that the employment of Judge Parsons in the first in-
stance was with the full knowledge and consent of the
entire council; that the purpose of that employment
was to aid the city attorney in the preparation of a
valid city ordinance under which the proposition could
be legally submitted to the judgment of the voters of
the city, and that in this respect, and also in the liti-
gation which followed immediately after the passage
of the ordinance and prior to the consummation of
the purchase, the interests of the city and of the ap-
pellant were identical, namely, in *having the ordinance
adjudged and declared to be a legal and valid ordinance.*
That was the sole question submitted for determina-
tion in that litigation, and the interests of the city
and of the appellant being thus identified, there was
no impropriety in the employment of Judge Parsons,

or of the firm of Parsons & Corell, in the course of
that litigation.    Second, the record shows that the
council knew of the employment of Judge Parsons
and sanctioned it, and that each and every member of
the council had full knowledge of the further fact that
Judge Parsons was the law partner of the presiding
officer of. the council.    No objection was made or
urged upon that score, and fraud cannot be predi-
cated upon it.

Upon this branch of the case we are constrained to
say that we have read and carefully examined the en-
tire record, comprising nearly two thousand type-
written pages and numerous exhibits, and from such
examination are satisfied that there was no evidence
introduced at the trial which could have justified the
jury in finding that Mr. Corell or any other member
of the city council had been bribed or corrupted by
the appellant or induced by it to forego the discharge
of any duty which he or they owed to the respondent
city.    That all of the facts and circumstances relied
upon as constituting proof of fraud are consistent with
the presumption of honesty, and should be construed
accordingly, and under the rule laid down in *Pederson
v. Seattle, etc., Street Ry. Co.*, 6 Wash. 207 (33 Pac. 351),
and the numerous other cases already cited, the mo-
tion for non-suit in this case should have been granted.
We have felt less reluctance in reaching and announc-
ing this conclusion in view of a further fact disclosed
by the record.    By direction of the lower court the re-
marks of the learned trial judge in ruling upon appel-
lant's motion for a new trial have become a part of
the record herein.    These remarks were in part as
follows:

" Owing to the fact that Mr. Corell is a member of
the bar of this court, and that if the judge of the court

were convinced that he had been guilty of corruption in connection with a transaction of this kind, I think it would be the duty of the court to direct proceedings to be instituted for his disbarment; therefore, I think it the duty of the court to indicate a different opinion upon the issue submitted in regard to him from that which the jury has found. *And I am willing to say that if I regarded the verdict of the jury as advisory merely, I should find upon that issue differently from what the jury found.* Whether that is because I have observed the gentleman and am personally acquainted with him, and his professional character having been above reproach in every regard, of course, I am unable to say; *yet I feel that it is my duty, having heard all of the evidence, to say that much in exoneration of Mr. Corell.  .  .  .* Because I have thought, and I think now, *that the question was one of the pivotal questions without which the verdict could not be sustained;* and notwithstanding the feeling that *that finding is probably wrong,* yet in view of *what weight I think should* be given to the verdict of a jury, I think the verdict ought not to be set aside.

I have almost as much doubt in regard to the amount of this verdict as I have upon the issue in regard to Mr. Corell.  It is a matter that, if I regarded the verdict of the jury as advisory merely, I should be in the greatest doubt whether I would not reduce it almost one-half, *if not altogether.*  But for the reason that it was so difficult a matter to ascertain the value of property of this kind, I do not think that I am any better qualified to judge of the value of that property than the jury.  They were twelve men and there is only one of the court; and I am inclined not to disturb it even on that ground.  *It is questionable with me whether counsel for the city ought not* voluntarily to offer to remit a large portion of that verdict; and yet I do not feel that I would require them to do so or make it a condition upon which alone they could escape a new trial."

We think the learned trial judge labored under a

misconception of duty in overruling appellant's motion for a new trial, after expressing his dissatisfaction with the verdict.   Nothing can be clearer than that it was the *judgment* of the judge, as a result of his consideration of the case, that the verdict was opposed to the evidence on at least one of the material issues—or, as he correctly termed it, "one of the pivotal questions without which the verdict could not be sustained."   The statute which provides that the superior court shall award a new trial when the verdict is contrary to the evidence "means, of course, whenever in its *judgment* such is the fact, for otherwise the statute would be of no avail."   *State v. Billings*, 81 Iowa, 100 (46 N. W. 867.)

> " To a valid judgment the law requires, *first*, that there shall be a verdict upon evidence to satisfy the minds of the jury   .   .   .   .   and, *second*, that the judge who presides at the trial shall believe that the evidence is sufficient to justify the finding .  .  .  . From the record as made we are led decidedly to the conviction that it was the judgment of the district court   .   .   .   that the evidence was not sufficient to sustain the verdict.   With this fact apparent of record is there anything in the law to prevent our overruling a judgment based thereon, and in conflict with it?   If so, it is the shadow, and not the substance that is of controlling force, and such a conclusion must be sustained at a sacrifice of the very essence of judicial inquiry—*the truth*.  .  .   The convictions of the mind, when properly known, will override a work of the hand that merely notes an unsupported conclusion."
> —*Id.*

The judge who presided below apparently thought that if there was any evidence tending to support the material issues, the verdict was controlling on the court, notwithstanding it was the deliberate conviction of the judge that the evidence warranted a differ-

ent verdict.    Such is not the law.    In this respect the functions of the trial judge differs from those of the appellate court.    This difference is clearly pointed out by Mr. Justice BREWER in *Kansas Pacific Ry. Co. v. Kunkel*, 17 Kan. 172:

"The one has the same opportunity as the jury for forming a just estimate of the credence to be placed in the various witnesses, and *if it appears to him* that the jury have found against the weight of the evidence *it is his imperative duty* to *set the verdict aside.*    We do not mean that he is to substitute his own judgment in all cases for the judgment of the jury, for it is their province to settle questions of fact; and when the evidence is nearly balanced, or is such that different minds would naturally and fairly come to different conclusions thereon, he has no right to disturb the findings of the jury, although his own judgment might incline him the other way.    In other words, the finding of the jury is to be upheld by him as against any mere doubts of its correctness.    But when *his judgment* tells him that it is wrong, that whether from mistake, or prejudice, or other cause, the jury have erred, and found against the fair preponderance of the evidence, then no duty is more imperative than that of setting aside the verdict, and remanding the question to another jury."

"And he should be controlled by his own judgment in the case, and not by that of the jury."    *Williams v. Townsend*, 15 Kan. 564.

"The judge who tried the cause should not hesitate to set aside a verdict where there is a clear preponderance of evidence againt it."    *Nevada v. Mining Co.*, 5 Nev. 422.

"Where the trial court is of the opinion that the verdict is not supported by the evidence, or is against the weight of evidence, it should never hesitate in exercising the power and giving the aggrieved party a new trial."    *Reid v. Piedmont, etc., Life Insurance Co.*, 58 Mo. 421.

"If the judge is not satisfied with the verdict and is

convinced that it is clearly against the *weight* of the evidence, it is his duty to set it aside, even though there may have been some conflict in the testimony." *Dickey v. Davis*, 39 Cal. 565.

See, also, *Crossley v. O'Brien*, 24 Ind. 325 (87 Am. Dec. 329); *Chicago, etc., Ry. Co. v. Reardon*, 1 Kan. App. 114 (40 Pac. 931); *Kansas City, etc., R. R. Co. v. Ryan*, 49 Kan. 1 (30 Pac. 108); *Phillpotts v. Blasdel*, 8 Nev. 61; *Lockwood v. Atlantic Ins. Co.*, 47 Mo. 51.

The verdict in this case can be upheld only by disregarding principles which have long been considered necessary for the protection of the rights and property of the individual, and the judgment entered upon it will be reversed.

Hoyt, C. J., and Anders, J., concur.

Dunbar, J. (*dissenting*).—It will serve no good purpose to discuss the testimony in this case. I have read it all carefully and am convinced that there was sufficient legal proof of fraud to sustain the verdict. I therefore dissent.