[No. 25872. *En Banc.* March 12, 1936.]

ARTHUR G. JOHNSON *et al., Appellants,* v. SHELL OIL COMPANY OF CALIFORNIA *et al., Respondents.*[1]

[1]Reported in 55 P. (2d) 609.

*Vanderveer & Bassett* and *Clarence J. Coleman,* for appellants.

*Hyland, Elvidge & Alvord,* for respondents.

Beals, J.—During the year 1928, Arthur G. Johnson engaged in business in the city of Everett as the proprietor of a grocery store and automobile service station. On May 28th of that year, he entered into a "service station lease agreement" with Shell Oil Company of California, a corporation, one of the defendants herein, and, on December 7th following, the parties signed a supplemental contract, designated as "license and consignment contract." By the earlier of the two contracts, plaintiff rented his service station to the defendant company for three years from August 1, 1928, the lease calling for the payment of rental as follows:

"(3) Rental: The rental for the said premises shall be equivalent to two cents (2c) per gallon for each and every gallon of Shell gasoline purchased by the lessor during each calendar month for the entire term of the lease. The lessor will be credited monthly with said rental on merchandise credit memoranda according to statement as forwarded by the lessee on the first day of each month, i. e., rental for September will be credited on October statement. . . ."

By the second contract above referred to, the corporation appointed Mr. Johnson its agent for the pur-

pose of operating the service station. The contract describes in considerable detail the duties and obligations of the respective parties, the following portions of paragraphs 5 and 6 being material to the matters now before us:

"(5) The agent is hereby authorized to sell for cash to customers who take immediate delivery such gasoline of the company as may be in the custody of the agent on consignment at said service station, but only at the retail price which may be established and specified by the company from time to time therefor. The agent shall not dispose of any gasoline of the company except in strict accordance with the authority hereby conferred.

"(6) . . . To recompense the agent for the agent's expenditures herein contemplated and as a compensation to the agent the company shall allow the agent a commission of four ($0.04) cents per gallon for all gasoline sold at said service station."

Under these agreements, as above quoted, Mr. Johnson was to receive, by way of rental, two cents a gallon upon the gas which he sold, and an additional four cents a gallon by way of commission. The service station was operated under these agreements until March 29, 1929, when defendant S. H. Starr, representing defendant Shell Oil Company, procured Mr. Johnson's signature to an agreement entitled "service station sublease," which materially changed the terms and conditions upon which the service station should thereafter be operated.

During the month of April, 1933, Mr. Johnson and Elna Johnson, his wife, instituted this action against Shell Oil Company of California and S. H. Starr, alleging that Mr. Johnson's signature to the contract of March, 1929, had been fraudulently procured, and that the real and primary purpose of this contract was to enable the oil company to reduce the amount which it was obligated to pay the service station. It

was alleged that plaintiffs' knowledge of the English language was limited; that they were inexperienced in business; that the contract had been misrepresented to them; and that they had been damaged in a considerable sum by the fraud practiced upon them.

The action came on for trial upon the second amended complaint and the defendants' answer thereto. At the close of plaintiffs' case, defendants' counsel moved to dismiss, and challenged the sufficiency of the evidence, stating as the first ground in support of the motion that the action was predicated on fraud; that the fraud, if any, was committed in March, 1929, and that the action was not commenced for more than three years thereafter. The trial court sustained defendants' motion and entered judgment dismissing the action, basing the judgment expressly upon the sole ground that the action had not been commenced within the time limited by law. From this judgment, plaintiffs have appealed to this court. In this opinion, we shall refer to appellant Arthur G. Johnson as though he were the sole appellant, and to respondent Shell Oil Company of California, a corporation, as though it were the only respondent.

We shall first consider the question of the statute of limitations. Both parties rely upon Rem. Rev. Stat., § 159 [P. C. § 8166], par. 4, which reads as follows:

"Within three years: . . .
"4. An action for relief upon the ground of fraud, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud; . . ."

appellant contending that he did not discover the facts constituting the fraud until within three years next preceding the institution of the action, while respondent contends that over three years elapsed after

appellant was fully advised both as to the nature and terms of the contract which he had signed and as to respondent's interpretation thereof, and that therefore the action was not commenced within the time limited by law.

Appellant testified that Mr. Starr brought the contract of March 29th to him at the service station; that appellant was then very busy waiting on several customers, and that, seeing that Mr. Starr had some papers, appellant asked him if there was a new contract to sign, to which Mr. Starr replied in the negative, adding, however, that if appellant would sign the paper it would accelerate the payment of the two cents per gallon which appellant was receiving under the contract of lease above referred to, and that this payment would be credited to appellant at the time gas was delivered instead of paid in a lump sum a month later. Appellant's testimony is corroborated by that of his wife and his sister, who were present in the service station at the time the papers were signed. The last portion of the fifth paragraph of the "service station sub-lease," signed March 29, 1929, reads as follows:

"As a further consideration for this covenant and agreement, the sublessor promises and agrees at all times while this agreement shall be and remain in full force and effect to sell and deliver to the sublessee for resale from the demised premises gasoline at a price to sublessee not greater than the tank wagon price for commercial gasoline effective date of sale at Everett, Wash., said tank wagon price being no cents per gallon more than the sublessor's tank wagon price for commercial gasoline as determined and posted at sublessor's depot at Everett, Wash., including Washington State Motor Vehicle Fuel Tax. Commercial gasoline shall not be deemed to be any specially blended product or gasoline compounded with nonhydrocarbon substances."

At the time appellant signed this contract, he also, at Mr. Starr's request, wrote "accepted" on a letter directed to him, signed by Shell Oil Company, which letter reads as follows:

"Supplementary to that lease bearing date the 28th day of May, 1928, and that sub-lease bearing date the 29th day of March, 1929, the undersigned hereby agrees to pay you each month, a sum equivalent to one (1c) cent per gallon for each gallon of Shell Gasoline purchased under and during the term of said sub-lease."

Appellant testified that he did not receive copies of either of these papers at the time he signed them, but that three or four weeks later he received copies through the mail. He also testified that, previous to signing these documents, he had received a total payment of six cents upon each gallon of gas which he sold, and that thereafter he received only four cents a gallon. It seems probable that respondent accomplished this change by raising its "tank wagon price" and deducting appellant's four cents a gallon from the increased figure.

It must be remembered that, prior to the signing of the agreement of March 29, 1929, appellant had been operating under a consignment contract. The gas which he sold belonged to respondent. Under the last agreement signed, the situation was fundamentally changed, appellant then agreeing to maintain a gas station on the property described and to sell exclusively respondent's products, which respondent agreed to deliver to appellant at a price

" . . . not greater than the tank wagon price for commercial gasoline effective date of sale at Everett, Wash., said tank wagon price being no cents per gallon more than the sublessor's tank wagon price for commercial gasoline as determined and posted at sublessor's depot at Everett, Wash."

Clearly, the business relation between the parties was greatly changed. Referring to this contract, Mr. Starr testified:

"Q. Well, did you tell him what that was about? A. Yes, indeed. Q. You told him that would enable him to collect his rental at the time that the gasoline was dumped instead of at the end of the month? A. That is one of the things I told him. Q. Did you tell him that it would alter his margin of profit, and that after he had signed that he would receive a profit of four cents a gallon instead of six cents a gallon? A. No, sir. Q. You didn't tell him that? A. No, sir. Q. Now, that document refers to tank wagon price, doesn't it? We are referring now to Plaintiff's Exhibit 'C' for identification. A. Yes, it does. Q. What is tank wagon price, Mr. Starr, do you know? A. The tank wagon price is a price established by the petroleum industry as a certain fixed price to which they can tie their various transactions to. It is uniform, and adopted by all companies."

Later, asked if tank wagon price meant wholesale price, the witness replied that it did not. Mr. Starr testified that the tank wagon price was set up to "tie their various transactions to," although it was not the wholesale price. It does not appear that the term was used in the prior contracts between the parties.

Under the consignment contract, respondent had the right to fix the price at which appellant retailed respondent's gas. Mr. Johnson testified that respondent at all times fixed the retail price at which he should sell gas, and that he sold it at that price. Under the contract, either party could terminate the same on short notice, which rendered appellant's tenure thereunder subject to respondent's will.

As gas furnished to appellant was charged at a tank wagon price arbitrarily fixed by respondent, if respondent fixed the price at which appellant should retail his gas, manifestly appellant's profit or commis-

sion on each gallon sold amounted to any sum respondent desired. On the face of the accounts, appellant was allowed four cents a gallon and two cents a gallon rental, but as a practical proposition this allowance might or might not represent appellant's actual receipts on the gallonage which he sold. Appellant testified that he received less than the amount indicated.

The following epitomizes appellant's evidence: Appellant, feeling that he was not receiving his just dues, complained to Mr. Starr, who, appellant testified, stated that he would call and straighten the matter out. As Mr. Starr did not call, appellant spoke to him again, and received another promise. As no adjustment was made, appellant testified that he went to Seattle to call on the company's representatives there; this about March or April, 1930. Appellant testified that the company's district manager told him that the matter would be straightened out, intimating that they might pay him five cents a gallon. Appellant, however, heard nothing more of the matter until a Mr. Hodges, who had succeeded Mr. Starr as respondent's representative in Everett, called upon appellant, stating that he had been advised that there was some controversy between appellant and respondent, suggesting that the two go to Seattle and discuss the matter with the company's officers there. This plan being carried out, appellant testified that he was finally told by the company's attorney that no adjustment would be made.

It appears from the record that, during the month of November, 1930, appellant consulted an attorney, who wrote respondent's Seattle office concerning appellant's difficulties. The attorney wrote two subsequent letters, the last dated February 28, 1931, in reply to which respondent's assistant division man-

ager wrote the attorney, stating that appellant had received all sums due him from respondent. The action, of course, was commenced within three years after the receipt of this letter.

. Mr. Starr testified that he did not remember whether or not he explained to appellant the meaning of the phrase "tank wagon price." The witness also stated that he had called on appellant two or three times in response to requests, appellant complaining that he was not receiving all sums due him from respondent, no definite adjustment or even explanation having been made.

Appellant was born in Finland March 30, 1890. He came to this country in 1911, and received his certificate of naturalization as an American citizen in 1930. He can read and write English, but naturally his understanding of the language is somewhat limited.

The phrase "tank wagon price" is a technical phrase requiring explanation. One might well suppose that it meant the price at which the company sold gas from its tank wagons, but it clearly appears that this is not the meaning of the phrase placed thereon by respondent. The phrase is not explained in the contract, and the result of the contract, in so far as sums which respondent would be required thereunder to pay appellant are concerned, might well depend upon the interpretation to be placed upon this phrase.

This court, in the case of *Jones v. Standard Oil Co.*, 164 Wash. 83, 2 P. (2d) 76, held that a clause in a contract creating an agency under which a gasoline service station was to be operated, referring to "our posted service station or posted plant price," was ambiguous, and that parol evidence was admissible to explain the meaning thereof.

While it is elementary that one who signs a

contract which he had every opportunity to read cannot be heard to say that he did not read the same (*Washington Central Imp. Co. v. Newlands,* 11 Wash. 212, 39 Pac. 366; *Tacoma v. Tacoma Light & Water Co.,* 16 Wash. 288, 47 Pac. 738; *Zilke v. Woodley,* 36 Wash. 84, 78 Pac. 299), this rule is not controlling here, as the contract was ambiguous and required explanation; and, in addition, appellant testified that his signature to the contract was secured by misrepresentation.

In the case at bar, the parties were not strangers, dealing at arm's length. Contracts already existed between them, under which appellant had been representing respondent, apparently to their mutual satisfaction, for several months. The question now under discussion, in connection with the application of the statute of limitations, does not involve, strictly speaking, an interpretation of the contract, but merely the date upon which it should be held that appellant had notice of the meaning of the contract, or respondent's interpretation thereof, in order to start the running of the statute against him.

While appellant, of course, knew that he was not receiving from respondent as much as he contended he should receive, the evidence indicates that he did not understand the theory upon which respondent was paying him. The record supports his contention that he was, for a long period of time, led by respondent to believe that the matter was open to negotiation, and that respondent's position in the matter was not definitely determined. In the case of *Gustafson v. Cullen,* 155 Wash. 107, 283 Pac. 1087, in discussing a somewhat similar question, this court said:

"Mere nonpayment does not of itself indicate wrongdoing or misapplication of the fund. It is alleged that excuses were offered which satisfied him for about a year, but there is nothing in the complaint as to what, if anything, he did from about June 1,

1925, up to the beginning of the three-year period next preceding the filing of the complaint. Can we assume simply from his not having been paid that he could and should have discovered within that period of five or six months that the respondent Cullen had diverted the money to his own use? To do so, would be to disregard the rule that all men are presumed to act honestly until the contrary appears.''

If, immediately upon question of its account by appellant, respondent had made it clear that the amount paid was all that was due appellant, and that the respondent did not recognize any ground for appellant's contention that he was receiving less than was actually due him, an entirely different question would be presented. But, on the contrary, it appears that respondent did not take any such definite stand until many months after appellant had questioned its accounts.

Of course, as above stated, we have before us appellant's evidence only, but from the evidence it clearly appears that he was, for some time after he signed the contract, insisting that he was not receiving his just dues thereunder. He testified that some of respondent's representatives indicated that his contentions were, at least in part, well founded. Respondent at all times knew exactly the interpretation which it placed upon the contract of March 29th. This contract is in itself ambiguous. As far as shown by the record before us, appellant, relying upon the statement made to him by respondent's representative to the effect that the document which he signed had merely the effect of accelerating the time he would receive certain payments from respondent, signed the contract, thereby without adequate, or any, consideration placing himself in a position which allowed respondent to compute the commission which appellant was to receive upon a basis arbitrarily to be fixed by itself.

We conclude that appellant made a *prima facie* case of an imposition upon him which amounted to fraud in law, and that this fraud, depending as it did, not upon the contract itself, but upon some interpretation thereof, was not discovered by appellant until the respondent made its interpretation of the contract definitely clear to appellant, which latter date was well within the period of three years next prior to the institution of the action. We conclude, then, that the trial court erred in ruling that the cause had not been commenced within the time limited by law.

Appellant argues that the only question which should be considered on this appeal is whether or not the action is barred by the statute of limitations, while respondent contends that, if we should hold in appellant's favor upon that question, it is nevertheless entitled to urge that its challenge to the sufficiency of the evidence should have been sustained upon the ground that appellant failed to make a *prima facie* case. Respondent's position upon this point is correct. It moved generally to dismiss the case, and challenged the sufficiency of the evidence upon the ground that it should be held, as matter of law, that the same was insufficient to sustain any recovery. The fact that the court decided the case upon the ground of the statute of limitations does not preclude respondent from contending that the action should have been dismissed upon the other ground hereinabove referred to.

In this connection, it must be remembered that we are here concerned only with the question of whether or not appellant made a *prima facie* case. Respondent cites the cases of *Shell Oil Co. v. Wright,* 167 Wash. 197, 9 P. (2d) 106; *Jewell v. Shell Oil Co.,* 172 Wash. 603, 21 P. (2d) 243; *Robinson v. Shell Oil Co.,* 172 Wash. 611, 21 P. (2d) 246; *Searl v. Shell Oil*

*Co.,* 172 Wash. 621, 21 P. (2d) 249; *Shell Oil Co. v. Henry,* 175 Wash. 298, 27 P. (2d) 582; contending that, in these cases, the court upheld contracts either identical with the one here in question or very similar thereto. True, these cases were decided in favor of respondent, and the contract, no fraud appearing, was held binding. In the case at bar, appellant contends that the signature to the contract was procured by such misrepresentations as to amount to fraud.

Respondent argues that appellant contended that he had not received his rent. While it may be true that appellant's ideas as to the exact description of the money which he had failed to receive were not of the clearest, we are convinced that, from the evidence as a whole, it must be held that appellant made a case upon which he was entitled to the judgment of the trier of the facts as to whether or not he had been induced by fraud to sign the contract, and had received from respondent all the payments to which he was entitled.

The trial court erred in ruling that the cause was barred by the statute of limitations, and we are convinced that, on the facts, it must be held that appellant made a *prima facie* case sufficient to require the denial of respondent's motion for judgment in its favor, as matter of law.

The judgment appealed from is reversed, with instructions to proceed in accordance with this opinion.

MITCHELL, TOLMAN, HOLCOMB, and GERAGHTY, JJ., concur.

BLAKE, J. (dissenting)—The sublease entered into by appellant on March 29, 1929, contained the covenant that he would buy gasoline at respondent's posted tank wagon price at its office at Everett. The provi-

sion (and, in fact, the sublease) is identical to that construed in the cases of *Shell Oil Co. v. Wright,* 167 Wash. 197, 9 P. (2d) 106; *Jewell v. Shell Oil Co.,* 172 Wash. 603, 21 P. (2d) 243; *Robinson v. Shell Oil Co.,* 172 Wash. 611, 21 P. (2d) 246; *Searl v. Shell Oil Co.,* 172 Wash. 621, 21 P. (2d) 249; and *Shell Oil Co. v. Henry,* 175 Wash. 298, 27 P. (2d) 582, wherein this court held that the agreement was unambiguous and not subject to explanation by parol. In the *Searl* case, the court said:

"The writings evidencing the contract between the parties are plain, definite and unambiguous as to price. The testimony offered would have had the effect of modifying the terms of a written contract by parol evidence. It is fundamental that this can not be done."

But appellant says that this case differs from those, in that respondent made fraudulent representations which induced him to execute the sublease. What is this alleged fraudulent conduct? Merely that the appellant was busy at the time the sublease was presented to him for execution, that he did not read it, and that respondent's agent misrepresented to him the contents and purport of the instrument. There is no allegation or proof of any artifice used to procure appellant's signature. He was *compos mentis* and able to read and understand the English language.

In a long line of decisions, this court has held that, under such circumstances, misrepresentation as to the contents or purport of an instrument does not constitute actionable fraud. *Washington Central Imp. Co. v. Newlands,* 11 Wash. 212, 30 Pac. 366; *Sherman v. Sweeny,* 29 Wash. 321, 69 Pac. 1117; *Hubenthal v. Spokane & Inland R. Co.,* 43 Wash. 677, 86 Pac. 955; *Golle v. State Bank of Wilson Creek,* 52 Wash. 437, 100 Pac. 984; *Fidelity & Casualty Co. of New York v. Nichols,* 124 Wash. 403, 214 Pac. 820. In *Johnston*

*v. Spokane & Inland Empire R. Co.,* 104 Wash. 562, 177 Pac. 810, the court said:

"We have always held that a party whose rights rest upon a written instrument which is plain and unambiguous, and who has read or had the opportunity to read the instrument, cannot claim to have been misled concerning its contents or to be ignorant of what is provided therein."

I therefore dissent from the conclusion reached by the majority.

MILLARD, C. J., MAIN, and STEINERT, JJ., concur with BLAKE, J.

