[No. 15557. Department Two. April 5, 1920.]

## Charles Klundt et al., Respondents, v. John Bachtold, Appellant.[1]

Landlord and Tenant (15)—Lease—Live Stock and Increase—Title. A farm lease vested an undivided half interest in hogs shipped for sale in each of the parties, where it provided that each is to have one-half of the proceeds of the sale when any of the hogs or their increase are sold.

Same (15) — Live Stock—Sale and Collection of Proceeds—Rights of Coowner. Under a farm lease contemplating that the hogs and their increase be sold, and giving each party a half interest in the proceeds of all sales, the lease expressly providing that no partnership existed, neither party could sell the hogs without the other's consent.

Tenancy in Common—Unauthorized Sale—Remedies of Coowner. Where an owner in common of hogs sells them and they are destroyed, the other owner may recover the value of his interest from the purchaser.

Same—Sales—Duty of Purchaser. Since the seller of personal property can convey no greater title than he has, the purchaser of hogs from one in possession, who owned only a half interest and

[1]Reported in 188 Pac. 924.

had no right to sell them, acts at his peril and is bound to see that one-half the proceeds are paid to the rightful owner.

Trover and Conversion (5)—Purchase of Property From one Other Than Owner. If one buys personal property of one who has no authority to sell, his taking possession in denial of the owner's right is a conversion.

Appeal (388)—Parties Entitled to Allege Error. That a judgment for plaintiff against two of the defendants was in excess of the amount due cannot be complained of by the plaintiff, nor by the defendants who did not appeal.

Fraud (22)—Money Received (6)—Mortgagee's Acceptance of Proceeds of Unauthorized Sale—Evidence of Fraud—Sufficiency. Where an owner in common of hogs, having only a half interest, sold the entire interest to an innocent purchaser and requested the purchaser to make a check for part of the proceeds to B, a mortgagee of his half interest in the hogs, who applied part of such payment on the mortgage debt and paid over the balance to the seller, B is not liable to the purchaser and the seller's coowner, who never received his half of the proceeds, on the theory of a conspiracy by B to assist in defrauding them, where the check to him was less than the seller's half interest, he was ignorant of the rights of the parties to the sale and had no notice of the sale until presented with the check, and retained no benefit himself outside of paying part of the mortgage indebtedness to himself.

Cross-appeals from a judgment of the superior court for Franklin county, Truax, J., entered April 19, 1919, upon findings favorable to the plaintiff, in an action for conversion, tried to the court. Modified on defendant's appeal.

*H. B. Noland,* for appellant.

*B. B. Horrigan,* for respondent Klundt.

*Danson, Williams & Danson,* for respondent Ed. Priest.

Bridges, J.— October 1, 1917, Jacob Klundt and Albert Bayer entered into an agreement whereby the former leased to the latter, for a period of five years, a farm in Franklin county, Washington. That instrument, in so far as it affects this case, reads as follows:

"It is agreed that the lessor is leaving on said place hogs and pigs about 20 in number, that the lessee is to attend to the same and care for them and the increase thereof, that as to all feed that is bought for the purpose of feeding such hogs or pigs ·or the increase thereof, each party hereto is to pay one-half; that of the hogs or pigs so left on the place, the same are to be weighed by the parties hereto, and that at the termination of this agreement the lessee will leave on said place a like number, weight, kind and quality considered. It is understood that as to all feed for such pigs, except pasturage, each party is to pay or provide one-half. When the said hogs or pigs are sold, or any of the increase thereof, each party is to have one-half of the proceeds of sale.

"It is further agreed that the lessor is leaving on said place twelve cows and three heifers, which the lessee agrees to care for and the increase thereof, and the lessee is to get therefor one-third of the increase, he is to have the right to all milk from such cows (as) is used on the place. On the termination of this agreement he is to leave on the place a like number of cows and other cattle, kind, weight and quality all considered, but should any of the original stock die in the meantime, each party hereto is to stand one-half of the loss. Should any of the original stock left on the farm be sold before the termination of this agreement, it is understood that lessor is to have the money obtained therefor.

"It is understood that this agreement is one of lease and not one of partnership, and that the lessor shall not become responsible for any debts contracted by the lessee. . . ."

At once, after the execution of this instrument, Bayer entered into possession of the property, and continued in such possession until after the transactions here sued upon. On August 30, 1918, Jacob Klundt sold to Charles Klundt all of the hogs involved in this action. On or about the 20th of September, 1918, Bayer shipped to Spokane, from the farm which he rented, a carload

of hogs; seventeen of the hogs so shipped were a part of the original hogs mentioned in the lease; the remainder of the carload was a part of the increase. These hogs were sold to the defendant Priest, who, at Bayer's request, made his check to the defendant Bachtold for less than one-half of the sale price, and his check to Bayer for the balance.

The case, which was tried to the court without a jury, resulted in a judgment in favor of the plaintiff and against Bayer and Priest in the sum of $1,154.73, with interest from September 21, 1918, the judgment to be first satisfied out of the property of Bayer, and execution to be issued against Priest only after exhausting Bayer. There was also a judgment in favor of Priest against Bayer in the sum of $1,154.73, or such part thereof as Bayer should fail to pay to the plaintiff. There was also a judgment in favor of Klundt and Priest against Bachtold for $789.63 (being the amount of the check he had received from Priest), or for such part thereof as shall not be paid by Bayer to the plaintiff. The defendant Bachtold has appealed from that part of the judgment in favor of Priest and Klundt against him. By the cross-appeal of the plaintiff, it would appear that he complains that the judgment in his favor against Bayer, Priest and Bachtold is in an insufficient amount. Bayer and Priest have not appealed.

I. The cross-appellant, as we understand him, contends that the seventeen old hogs, which were on the place when the lease was made, were, by the terms of the lease, his property, and that the defendant Bayer had no interest in them, and that the proceeds from the sale of the increase were to be divided equally between himself and Bayer, while Bayer claims one-half interest in all the hogs. It is also contended by Klundt that Bayer had no right or authority to ship or sell

any of the hogs without his knowledge and consent. It is conceded that Klundt has never been paid any portion of the sale price of the hogs shipped by Bayer. The trial court seems to have held that Klundt owned all the seventeen hogs and an undivided one-half interest in the remainder of the shipment.

Our construction of the lease between Klundt and Bayer is that each became the owner of an undivided one-half interest in all of the hogs that were shipped, and each was entitled to receive one-half of the net proceeds of the sale at Spokane. The trial court seems to have read the two paragraphs of this lease with reference to the hogs and to the cows as though they were one paragraph, and in so doing concluded that the clause found in the paragraph with reference to the cows, and reading as follows: "Should any of the original stock left on the farm be sold before the termination of this agreement, it is understood that lessor is to have the money obtained therefor," had reference not only to the cattle, but also to the original hogs. We think that the paragraph with reference to the hogs must be read separate and apart from the paragraph with reference to the cattle, and that the expression in the lease referring to the "original stock" meant original cattle and not the original hogs. To otherwise construe the lease would be to read out of it the last sentence with reference to the hogs, reading as follows: "When said hogs or pigs are sold, or any part of the increase thereof, each party is to have one-half of the proceeds." The hogs, pigs and increase thereof, mentioned in the last quoted clause, necessarily refer to and include all of the hogs, whether on the place at the time the lease was made or the increase thereof. The result of our construction is to make Klundt and Bayer each the owners of an undivided one-half of all the hogs which were shipped, and

each is entitled to one-half of the sales price, after deducting the necessary expenses.

The question then arises, Was Bayer entitled to sell the hogs and collect the proceeds? That the lease contemplated that both the old hogs and the increase would at some period during the lease be sold, there cannot be any question, but it does not follow from this that Bayer had a right to sell them or to collect the sales price. He had a right to sell his undivided interest, but no more. These hogs were not owned by Klundt and Bayer in partnership, because a reading of the lease would negative that idea, and besides, the parties have expressly agreed in the lease that there is no partnership existing. It must follow, therefore, that these parties had a common ownership of the hogs. Where there is a common ownership of personal property, neither party has any right to sell or dispose of the entire interest in the property. At page 886, vol. 7, R. C. L., where this question is discussed, it is said:

"The title to an undivided portion of personal property is just as complete in the party who holds it, so far as his portion is concerned, as if he owned the entire chattel. He may sell, pledge, mortgage, bequeath, or otherwise deal with it as with any other property which he may possess. But while an owner in common of personal property has a right to dispose of his own undivided share, he cannot sell the whole property, nor any portion thereof except his own; and if he undertakes to dispose of any larger interest, his co-owners are not bound thereby. This is based on the well-settled principle that a seller of personal property can convey no greater title than he has, and it makes no difference that the purchaser has no notice and is in ignorance of the existence of other parties in interest."

To the same effect see 17 Am. & Eng. Ency. Law (2d ed.), 680; *Tuttle v. Campbell,* 74 Mich. 652, 42 N. W. 384, 16 Am. St. 652; *Trustees of Ashland Lodge, No.*

*63, I. O. O. F. v. Williams*, 100 Wis. 223, 75 N. W. 954, 69 Am. St. 912; *Russell v. Allen*, 13 N. Y. 173; *Frans v. Young*, 24 Iowa 375. Where one who has a common ownership with another of personal property undertakes to and does sell the whole of the property, there is one of two courses open to the other owner; first, he may become coowner with the new purchaser, or, if the new purchaser has destroyed the property, he may recover of him the value of his interest. 7 R. C. L. 886; 17 Am. & Eng. Ency. Law (2d ed.), 381; *Davis v. Burnett*, 4 Jones' Law (49 N. C.) 71, 67 Am. Dec. 263.

It appears in this case that the hogs were destroyed shortly after Priest purchased them, and Klundt has been required to elect to recover of Priest the value of his interest in the hogs, and this is the relief which the lower court undertook to give.

II. We have said that Bayer had no right to sell Klundt's interest in these hogs, and it must, of course, follow that Priest had no right to buy that interest, or, if he bought it, he was bound to see that one-half of the sales price, after proper deductions, was paid to Klundt, the rightful owner. In this court Priest has argued that he was an innocent purchaser, that the hogs were in possession of Bayer, who represented that he had a right to sell them, and therefore he had a right to pay Bayer the whole of the purchase price. There was, however, considerable testimony tending to show that Priest was warned before he paid for these hogs that there was a dispute about them and their ownership and the right of Bayer to sell, and the lower court found that Priest had sufficient knowledge of this controversy to warn him, and that he was, on that account, bound to see that the purchase price was paid to the persons entitled to it. With this finding of the trial court we agree, but we think there was

no necessity for the court to have made such a finding in order to hold Priest. Without any previous warning, it would be his duty to know whether Bayer had the right to sell the hogs and to collect all of the sale price; and in making the purchase, he did so at his peril. Any other rule would be exceedingly dangerous, and the authorities so hold. In *Tuttle v. Campbell, supra,* the court said:

"The principle is well settled that a seller of personal property can convey no greater title than he has, and it makes no difference that the purchaser has no notice and is ignorant of the existence of other parties in interest."

Cooley on Torts (2d ed.), page 528, says:

"One who buys property must, at his peril, ascertain the ownership; and, if he buys of one who has no authority to sell, his taking possession, in denial of the owner's right, is a conversion."

See, also, 7 R. C. L. 879, 887; *Rains v. McNairy,* 4 Humphreys (23 Tenn.) 356, 40 Am. Dec. 651.

The trial court found that the total sale price of the hogs, after making proper deductions, was $1,780. Inasmuch as Klundt and Bayer each owned an undivided one-half interest, each would be entitled to one-half of that amount, or $890. The judgment of the lower court in favor of Klundt and against Bayer and Priest was for a sum in excess of this amount; consequently, Klundt is not in position to complain. But, in any event, it is immaterial, in so far as Priest and Bayer are concerned, for what amount or for what reason the court gave judgment against them, because they have not appealed. The conclusion to which we have come requires an affirmance of that part of the judgment which is in favor of Klundt and against Bayer and Priest.

III. The complaints made by the cross-appellant, Klundt, against Bachtold will be disposed of in the consideration of the appeal of the latter.

IV. It is now necessary for us to consider Bachtold's appeal. It will be remembered that there was a judgment against him and in favor of Klundt and Priest in the sum of $789.63. He contends that that judgment should not have been given, but, on the contrary, that he should have been dismissed out of the cause. Let us see what his connection with this transaction was.

The complaint charges that he, Priest and Bayer conspired together for the purpose of defrauding Klundt, and it has been strenuously argued by the attorneys for both Priest and Klundt that the record shows that he had not dealt fairly. We have not only read all of the testimony, but have read important parts of it several times. We are unable to find anything which shows, or seriously tends to show, that Bachtold was engaged in any conspiracy to defraud Klundt, or that his transactions in connection with this deal were wrong, or that he was guilty of any overreaching. Priest has been held liable not for any wrongdoing, but because of his negligence; if Bachtold is to be held liable it must be because of certain inflexible and rigid rules of law, and not because the testimony shows any active wrongdoing.

For more than ten years prior to this transaction, Bachtold and Bayer had been acquaintances, and the former had often loaned money to the latter to assist him in his business affairs. Bachtold knew that Bayer had rented the Klundt farm and knew that Bayer had an interest in the stock on the place. He had understood that Bayer had an undivided one-half interest, or that the stock was to be divided and each, Klundt and Bayer, was to own the stock so divided. He knew

that Bayer owed the First National Bank of Pasco some $500 or $700, to secure which Bayer had given the bank a mortgage on a part or all of the hogs in question, together with other property. Previous to this time, Bayer had borrowed from the Third National Bank of Walla Walla $200 and Bachtold had indorsed the note, and this amount was past due. Bachtold had also made a personal unsecured loan to Bayer for $225. For some time previous to the transactions involved here, he had been trying to get Bayer to secure payment of these debts. There had also been some talk between them looking towards Bachtold lending Bayer additional sums to buy seed wheat and feed for hogs, and Bachtold had expressed a willingness to make further loans, provided he was properly secured. A short time before the hogs were shipped to Spokane, Bayer gave to Bachtold his note for $1,500 and a mortgage on his interest in the hogs and other personal property to secure the note. The $225 which Bayer already owed Bachtold was to be a part of the note, and that sum was secured by the $1,500 mortgage. Bachtold intended, from time to time, to advance further sums to Bayer under this $1,500 mortgage, but he never did so. This mortgage was subject to that previously given to the First National Bank of Pasco. Bachtold also knew there was some trouble or disagreement between Klundt and Bayer, and that the former was in some way dissatisfied with the latter, but did not know the cause of the dispute. This, then, was the situation, so far as Bachtold was concerned, at the time the hogs were shipped.

After the hogs reached the stockyards at Spokane, Klundt caused a man to go there for the purpose of stopping the sale of the hogs. This man spoke to several hog buyers around the yards, but did not talk to, nor within the hearing of, Priest, who bought the hogs

rather late in the afternoon. Priest, however, heard from some source during the day that there was trouble about the hogs, although he did not know what the trouble was. He learned that Bayer had been talking over the telephone with someone about the hogs, and when it came to paying him, Priest asked him if there was any trouble about the hogs, and he told him there had been some trouble during the day, but that it was settled, and requested a check for $789.63 to be made to Bachtold, and a check for the balance to be made to him. Priest complied with these requests without further investigation. He supposed Bachtold was a part owner of or interested in the hogs because of the request that a check be made to him, but no person told him Bachtold was part owner. It appears that, during the day, Bayer had talked over the telephone with some attorney in Walla Walla about the hogs and was told that he had a right to sell them, but that he ought to have a part of the check in payment thereof made to the mortgagee, and that he would have no right to sell mortgaged personal property without so doing. Bayer testified that this was the reason he had one of the checks made to Bachtold. When Bayer brought this check to Bachtold the latter had not known that the hogs had been shipped and made inquiry of Bayer concerning the check and its amount. Bayer explained to him that he had shipped part of the hogs to Spokane and sold them and that the check was made to him because he was the mortgagee. At the time of handing the check to Bachtold, Bayer requested that, when it was cashed, most, if not all, of the money be given to him, as he intended to pay a part of it to the Third National Bank and wanted the balance for farming purposes. To this Bachtold agreed. The check was sent for collection in the ordinary course, and when collected Bachtold paid $208 or $210 thereof to the

Third National Bank of Walla Walla in payment of the Bayer note which Bachtold had indorsed, and he gave Bayer checks for the remainder of the money.

When the court made its first findings and judgment, it found in favor of Bachtold, and entered judgment dismissing the action as to him and giving him costs. Later, however, the trial court made an additional finding to the effect that Bachtold had received the Priest check with knowledge and information, under the circumstances, sufficient to have aroused his suspicions and to have prompted due inquiry as to the source of the check and the reason for its execution, and concluded therefrom that Klundt and Priest were entitled to a judgment against him in the sum of $789.63, being the amount of the Priest check to him, and subsequently an entirely new judgment was made wherein judgment was given according to this conclusion.

We believe that the foregoing is a fair statement of Bachtold's connection with this case.

Priest seeks to maintain his judgment against Bachtold upon the theory, as expressed in his brief, that "Bachtold, upon receiving a check which he knew, or must have known, was given for the hogs, stood in the same position as if he had himself sold the hogs to Priest when he had no title thereto," and upon the further ground that "one who receives money belonging to another, the payment of which has been procured to him by fraud or misrepresentation of a third party, is liable to the true owner." These principles are based on equity and not on contract. In each case involving them the court is called on to apply, not fundamental and well fixed rules of law, but its sense of fairness and its ideas of right and wrong. Many cases are cited in support of those principles. We have read them, but think they have but little appli-

cation to the facts of this case. They are of the following character:

The case of *Newburyport v. Fidelity Mutual Life Ins. Co.*, 197 Mass. 596, 84 N. E. 111, was one where the city treasurer of Newburyport bought some insurance of the defendant and paid for the same with checks bearing the name of the city and signed by him as its treasurer. The court held that the insurance company was charged with notice that it was receiving the funds of the city in payment of an individual debt.

The case of *People's Nat. Bank of Rock Island v. Myers*, 65 Kan. 122, 69 Pac. 164, decided that one who through the design or misdirection of another received money which he knew belonged to a third person, cannot retain it for application on his own debt.

In the case of *Merrill v. Brantley*, 133 Ala. 537, 31 South. 847, the facts were that the plaintiff held a mortgage on all of the cotton to be grown by one Wallace; the defendant held a second mortgage on the same cotton. Later, defendant sold this cotton to the plaintiff, the latter believing that the defendant was the owner of it, and was not aware that it was the cotton covered by his mortgage. Having paid the defendant the purchase price, he sued to recover on the ground that he was entitled to the money to be applied on his mortgage, of which the defendant had information.

In the case of *Union Stock Yards Bank v. Gillespie*, 137 U. S. 411, it was held that one who takes from a factor in payment of his debts money which he knows equitably belongs to the factor's consignee or principal must account to the principal therefor.

In the case of *Alter v. Bank of Stockham*, 53 Neb. 223, 73 N. W. 667, it was held that where a mortgagor of chattels converts the same into cash and deposits the money with his agent, who has notice of the mort-

gage lien, an action will lie at the suit of the mortgagee against the agent for the proceeds.

The foregoing are samples of the cases cited.

The case of *Bowles Co. v. Clark,* 59 Wash. 336, 109 Pac. 812, 31 L. R. A. (N. S.) 613, is cited. The facts were that one Fraser had contracted to do certain plumbing on the premises of Clark. He informed the latter that it was necessary to obtain certain plumbing material, and that he did not have the cash to buy it, and did not have the credit to obtain it, and asked that Clark advance sufficient money for that purpose. Upon learning from Fraser that he desired to buy the goods from Bowles Company, he made a check for the necessary amount, payable to Bowles Company, and gave it to Fraser, who thereupon delivered it to Bowles Company, who gave him credit on an old bill and sold him on credit the plumbing for the Clark building, but without knowing that it was for Clark. Fraser failed to pay for the plumbing and Bowles Company filed a lien on Clark's premises, and the question was whether or not the lien could be foreclosed. It was held that the money obtained from the check should have been used to pay for the plumbing articles purchased and that the lien could not be foreclosed. The court said:

"But we think it too much to say that these circumstances were of such a nature as to warrant the belief that the property in the check was the property of Fraser. The check itself contained a distinct warning to the contrary. It was made payable to the respondent, a stranger to the drawer, and not to Fraser, and it is not reasonable to suppose that Fraser would have accepted payment of an obligation due himself in a form which he could not use without the consent and cooperation of a third person."

We think the facts of that case have but little resemblance to the facts here and that it cannot be con-

trolling. There the check was made for the express purpose of buying new materials and not to pay an old debt of some one else; the Bowles Company made no inquiry to find out why the check had been given to them. In that case there was no reason at all why Clark should have made the check direct to the company if the purpose was to pay Fraser's debt. If the company had made the slightest inquiry the purpose of the check would doubtless have been disclosed. When Bachtold received this check made by Priest he did not know that Priest had so made it supposing that he was a part owner of the hogs; all he knew was that Bayer had caused it to be made to him because he held a mortgage on the property. He did not get any of the money represented by the check; he did not even pay out of it the amount which Bayer owed him; he did not know that Klundt had not been paid, or that Bayer intended to defraud Klundt by not paying him his portion. He supposed, and he had a right to suppose, under the circumstances, that the money belonged to Bayer. It represented less than one-half of the amount which the hogs had brought; certainly Bayer had a right to do whatever he saw fit with his half of the money. Here we have a judgment for nearly $800 against Bachtold, when the latter had received no benefit whatever from this transaction except to have the small note upon which he was indorser paid. If the Third National Bank, which held the mortgage on these hogs, was trying to recover of Bachtold, who knew of this mortgage, we would have a question involving largely the same principles involved in the numerous cases which we have cited. Or if Bachtold had known, or had reason to know, that the check had been made to him because it was believed he was a part owner of the hogs, then he might be liable; but such are not the facts here. Priest himself was neg-

ligent and his negligence has brought about this diffi-
culty. He should have seen to it that the purchase price
for the hogs was paid to those who owned them, and
if he negligently gave a check to another, who received
it innocently and parted with the money, he should not
be entitled to protection against his own negligence.
He made Bayer his agent to deliver the check and he
ought to be bound by that agent's representations to
Bachtold.

Much of what we have said about the judgment in
favor of Priest against Bachtold is applicable to the
judgment given Klundt against Bachtold. But, in ad-
dition thereto, there was no privity between the two
parties. They had not had any dealing. The check
was intended for Bachtold and not Klundt. The former
was not indebted to the latter.

We think the first findings and judgment made by
the learned trial court were correct, and that he fell
into error in making his subsequent findings and judg-
ment against Bachtold. The judgment in favor of
Priest and Klundt against Bachtold is reversed and
the cause ordered dismissed as to the latter. In all
other respects the judgment is affirmed.

HOLCOMB, C. J., FULLERTON, TOLMAN, and MOUNT,
JJ., concur.