[1] Reported in 148 P.2d 962.
The late William H. Johnson was a pioneer land owner in the portion of Grant county north of the town of Hartline. His wife, whom he married late in life, died in 1933. He had no children. In August, 1942, Mr. Johnson was about eighty years of age, and owned five quarter sections of good wheat land and other land which was used as pasture. The balance of his property, which totaled over one hundred thousand dollars in value, consisted of cash and securities. For many years prior to his death, Mr. Johnson had passed most of his time in California, and had leased his farm on a share crop basis to an old friend of his, Roy Farley, whose son Darrel assisted in the farming operations. About 1937, Roy Farley ceased to farm the properties, and his son Darrel farmed the land under a lease from Mr. Johnson.
It was Mr. Johnson's custom to visit his farm in August of each year to oversee matters and attend to the sale of his share of the crop. After his wife's death, Mr. Johnson generally made these trips alone; sometimes, however, he was accompanied by his wife's sister, Ora Martin, who was by profession a trained nurse, and who afforded Mr. Johnson such care as his age and ill health rendered necessary. *Page 630 
Early in August, Mr. Johnson left his California home, intending to make his annual visit to his farm. On this occasion his sister-in-law did not accompany him. He stopped in Portland en route, where he suffered a stroke, from which he apparently recovered and continued his trip. When he reached Hartline he appeared to be normal, and obtained a room at a hotel operated by his old friends, Mr. and Mrs. Fred Hoff.
On the morning of August 18th, while eating breakfast, he suffered another stroke. Mr. and Mrs. Hoff assisted him to his room and put him to bed, but shortly thereafter he recovered sufficiently to go to the dining room and finish his breakfast, conversing without much difficulty with his friends. A physician residing in a nearby town was summoned, and in the course of the afternoon examined Mr. Johnson, stating his opinion that by the next morning he would feel better. However, during the evening and the following night, Mr. Johnson's condition grew gradually worse. His speech became thick, and before morning was unintelligible. His strength failed, and his right side became paralyzed. Roy Farley was summoned, and remained with Mr. Johnson during the night. The doctor who had attended him earlier in the day recommended that he be sent to a hospital in Spokane and placed under the care of Dr. J.W.D. Lynch.
During the morning of August 19th, Messrs. Farley and Hoff took Mr. Johnson to the Deaconess hospital in Spokane, where he remained until his death, which occurred August 31st following. When he entered the hospital, Mr. Johnson had completely lost the power of speech, which he never regained. Roy Farley remained in Spokane for several days, paying frequent visits to the invalid. While Mr. Johnson was in the hospital his condition required the continual service of a nurse, and three nurses were assigned to his care, serving eight hour shifts. Upon Mr. Johnson's arrival at the hospital, Dr. Lynch was summoned, and took charge of the case, remaining in attendance until Mr. Johnson's death. *Page 631 
August 20th, Roy Farley, realizing that Mr. Johnson's condition was critical, notified Miss Martin, at her home in Riverside, California, and she at once left for Spokane, where she arrived on the morning of August 22nd.
October 28, 1937, Mr. Johnson had executed his will. At this time he was a widower, both his parents were dead, and he stated in his will that he had never had a child. By his will he established a trust fund of twelve thousand dollars for the benefit of his brother, George W. Dibblee, the fund at the death of his brother to go to the brother's daughter, the testator's niece, Viola McGirr. He bequeathed to his "relative and friend," referred to in the record as his niece, I. Tillie Shaw, of Boston, three thousand dollars, to his sister-in-law, Ora L. Martin, seven thousand dollars, devising all the remainder of his estate to his niece Viola McGirr, a resident of Massachusetts. The Old National Bank of Spokane was named executor.
It appears that Mr. Johnson had not been in close contact with any of the relatives whom he named as beneficiaries under his will, but it also clearly appears that he had for them a high regard, as not long before his death he sent his niece Viola McGirr a five thousand dollar bond, sending also a bond of considerable value to Tillie Shaw.
During the course of the evening of August 21st, Roy Farley, who had been visiting the invalid, informed the nurse then in attendance, Margaret Devitt, that he believed that Mr. Johnson was trying to communicate some wish. It appears that much of the time the sick man was restless and mumbled as though endeavoring to express some thought to those in attendance. At the hearing, Mr. Farley testified that, when he approached close to Mr. Johnson in an effort to understand what the latter was trying to say, he thought he heard the word "Darrel," the name of Roy Farley's son. Mr. Farley stated that he then asked Mr. Johnson questions, and that Mr. Johnson would in reply nod affirmatively or shake his head negatively, thereby indicating his response to the questions asked.
By this process, Mr. Farley gained the impression that Mr. Johnson wished to give Darrel Farley something, and *Page 632 
at length Mr. Farley and also Mrs. Devitt obtained the impression that Mr. Johnson desired to make a change in his will. Mr. Farley, after several attempts to procure the attendance of a lawyer, called Mr. H.M. Hamblen, a member of the bar of this court, who went to the hospital, and was taken to Mr. Johnson's room. There, by a series of questions, most of which were propounded by Farley, and to which the sick man responded by an affirmative or negative movement of his head, it was concluded that the testator desired to leave two of his five quarter sections of land to Darrel Farley and the other three to Viola McGirr, Darrel Farley to select the two which he preferred. It appears that the questions propounded to the testator were carefully framed, in the endeavor to eliminate possibility of error in ascertaining the testator's wishes.
Mrs. Devitt testified that the questioning period lasted from fifteen to twenty minutes, and Mr. Hamblen testified that the entire length of his visit was from twenty to twenty-five minutes. After the questions had been propounded and answered, as above stated, Mr. Hamblen reduced to writing what he understood the testator's wishes to be, in the form of a codicil reading as follows:
"I, WILLIAM H. JOHNSON, of Hartline, Washington and Riverside, California, do make this codicil to my last will —
"First: I own five quarters of land in Grant county, Washington. I want Darred Farley to have two quarters and my niece to have three quarters and I hereby give and devise said land to said parties accordingly. Darrel Farley is [to] select the two quarters which he wishes and my niece shall have the other three.
"IN WITNESS WHEREOF I have set my hand this 21st day of August, 1942.
 "W.H. JOHNSTON JOHNSON
 "WITNESSES: MARGARET ROBERTS DEVITT R.N. H.M. HAMBLEN"
The nurse held Mr. Johnson's hand, assisting him to write his name, and then, with Mr. Hamblen, witnessed the codicil. In writing Mr. Johnson's name, it was erroneously *Page 633 
spelled Johnston, the correct last name being written beneath.
It appears that, after the codicil was executed, the sick man endeavored to convey to those present in his room some other idea, but it was impossible by questions or otherwise to ascertain what Mr. Johnson wanted. Dr. Lynch was not notified that it was proposed to assist Mr. Johnson in executing the codicil, nor was he informed that the same had been executed until after the death of the testator.
In due time the executor offered the will and codicil for probate, the executor's attorney stating to the court that he had some doubts as to the validity of the codicil. In view of this state of facts, the court instructed the executor to give notice to all interested parties, advising them of the time and place when the will and codicil would be offered for probate. The parties accordingly appeared by counsel, Dr. Lynch and Mr. Hamblen were present, as were two of the nurses and Roy Farley. Other witnesses were examined and, while Viola McGirr called no witnesses, her counsel cross-examined those witnesses who testified.
At the beginning of the hearing there was considerable discussion between court and counsel as to the effect of the proceeding, with particular reference to the question of whether or not, after such a hearing, an order admitting the will to probate would amount to a final adjudication upon the question of the testamentary capacity of Mr. Johnson, counsel for Viola McGirr contending that the proceeding was ex parte, the parties appearing merely as friends of the court. The court expressed no definite view, and the hearing proceeded, as above stated. At the conclusion of the testimony, the court admitted both the will and the codicil to probate, and no appeal from that order was taken.
Within the time limited by law, Viola McGirr initiated a will contest, which was heard by a judge other than the judge who admitted the will and codicil to probate. The hearing on the contest resulted in a finding that William Johnson was enjoying testamentary capacity when the *Page 634 
codicil was drawn, and the contest thereof was dismissed. From an order dismissing the will contest, Viola McGirr has prosecuted this appeal.
Error is assigned upon the trial court's refusal to hold that, at the time of the execution of the codicil, the testator lacked sufficient testamentary capacity to enable him to make the same; and upon the refusal of the trial court to find that the codicil was procured by fraud practiced upon Dr. Lynch, Mr. Hamblen, and the nurses in attendance.
In regard to the second assignment of error, the record contains no evidence which would support a finding that the codicil was procured by fraud.
Darrel Farley answered appellant's petition to revoke the codicil, denying the material allegations thereof, and by way of an affirmative defense thereto pleading as res judicata of the contest the proceedings had before the superior court which resulted in the will and the codicil being admitted to probate. Appellant demurred to the affirmative defense contained in Darrel Farley's answer, and March 2, 1943, the trial court entered an order sustaining this demurrer, allowing Mr. Farley an exception. The executor answered the contest, disclaiming any interest in the matter, save its desire to perform its duties as executor.
The contest came on regularly for hearing April 21, 1943, and resulted, as above stated, in the entry of the order dismissing the contest, from which this appeal has been prosecuted.
Respondent Darrel Farley in his brief argues two propositions: First, that, under the facts of this case, the order of the superior court admitting the codicil to probate constitutes resjudicata, as against contestant, as to the validity of the codicil; and second, that, upon the evidence in the record, the trial court was correct in entering the order dismissing the contest.
[1] The first question to be considered is respondent's contention that the order of the superior court above referred to, admitting the codicil to probate, is res judicata of the issues thereafter raised by appellant's contest. *Page 635 
In his answer to appellant's contest of the codicil, respondent, in addition to denials of the material allegations thereof, pleaded, as above stated, as res judicata, the proceedings had before the superior court at the time the codicil was offered for probate and the order of court admitting the codicil to probate. Appellant demurred to this affirmative defense, and the trial court entered an order sustaining this demurrer and allowing respondent an exception.
Respondent took no cross-appeal from the order dismissing the contest, which order was, of course, in his favor, and contends here that the trial court erred in sustaining appellant's demurrer to the affirmative defense above referred to; that in law his plea of res judicata was good; and that, irrespective of the merits, the order appealed from should be affirmed on the ground stated.
As we are convinced that this contention of respondent is without merit, we assume without deciding that respondent may present this question without having cross-appealed from the order dismissing the contest. Upon that procedural question we express no opinion.
Assuming for purposes of this opinion, then, that the validity of the plea of res judicata is before us for decision, we hold that, upon the facts and the law, the order admitting the codicil is not res judicata of the issues presented on the later contest.
It is true that, when the will and codicil were offered for probate, many witnesses were called, some by the executor named in the will, and others at the court's suggestion, and that appellant's counsel, who was present, interrogated some of these witnesses by a method that was equivalent to cross-examination. Appellant, however, called no witnesses, and, while the hearing, in so far as the codicil was concerned, was a more extensive investigation than is usual in the course of a hearing upon a will offered for probate, this did not change the nature of the statutory procedure. Rem. Rev. Stat., § 1380 [P.C. § 10049]; Inre Larson's Estate, 187 Wn. 183, 60 P.2d 19. *Page 636 
The proceedings reviewed by this court In re Findley'sEstate, 199 Wn. 669, 93 P.2d 318, did not involve a will contest, but concerned an attempt to establish an alleged lost will.
The situation presented in this connection is not analogous to a proceeding in which two wills are offered for probate and the court admits one and refuses to admit the other.
Upon the merits, a question of considerable difficulty is presented, to wit, Mr. Johnson's testamentary capacity at the time of the execution of the codicil. Upon the trial of the contest, which was heard in Grant county, the parties agreed that the testimony of the witnesses who had appeared at the prior hearing when the codicil was offered for probate might be read, either party to offer the testimony of such witnesses as he desired. This procedure was followed, and it must be remembered that the testimony to which we shall refer was offered pursuant to this situation, the witnesses having been called by the executor. The trial court did not have the benefit of seeing these witnesses and hearing them testify, but had merely the transcript of their testimony at the prior hearing, and was therefore in no better position than are we to evaluate their evidence.
It appears that Mr. Johnson was restless, that very frequently he mumbled in an attempt to speak, and that Roy Farley was the only witness who testified that the sick man ever uttered an intelligible word. Mr. Johnson could move his head and one hand, and in response to a question could, by nodding affirmatively or shaking his head negatively, apparently indicate that he understood the question, and could convey a simple affirmative or negative answer. Whether or not he actually could understand a question, and by moving his head was able to convey an intelligent answer thereto, is uncertain.
Upon the evening of August 21st, Roy Farley informed nurse Devitt that, while Mr. Johnson was endeavoring to speak, he, Farley, had leaned over in an attempt to understand what Mr. Johnson was trying to say, and that he heard Johnson utter the word "Darrel." Mr. Farley then, *Page 637 
in the presence of nurse Devitt, asked further questions, and both he and the nurse obtained the impression that Mr. Johnson wished to give Darrel something, the two concluding that Mr. Johnson desired to change his will. One of them, probably Mrs. Devitt, suggested that a lawyer should be summoned, and, after several attempts to procure the presence of an attorney, Mr. Farley called Mr. Hamblen, with whom he had no previous acquaintance, and, in response to Mr. Farley's request, Mr. Hamblen went to Mr. Johnson's room.
Mrs. Devitt testified that she had the impression that Dr. Lynch's consent to this step had been procured, but it afterwards transpired that such was not the case. Mr. Farley had spoken to the night supervisor in charge of the floor, who evidently knew that an attorney had been summoned.
After Mr. Hamblen arrived, he and Mr. Farley, in the presence of nurse Devitt, propounded questions to Mr. Johnson, to which he replied by nodding his head affirmatively or shaking his head negatively, and it was thought that Mr. Johnson desired to execute a codicil to his will, leaving two of his five quarter sections of land to Darrel Farley, and the remaining three to his niece, who, under Mr. Johnson's will, would have received all five of the quarter sections, Darrel Farley to have the privilege of selecting the two quarter sections which he preferred. Roy Farley asked most of the questions, but it appears that the questions were fair, and that all the witnesses present were of the opinion that Mr. Johnson's wishes were as above stated. From fifteen to twenty minutes was devoted to the questioning. Mr. Hamblen then wrote the codicil, read it to Mr. Johnson, and asked if it represented the testator's wishes, to which Mr. Johnson nodded his head affirmatively. The codicil was then executed and witnessed, as above stated.
The validity of the codicil depends upon whether or not at the time of the execution thereof the testator enjoyed testamentary capacity and understood what he was *Page 638 
doing, and was capable of conveying to others his wishes in respect to these matters.
Naturally, the testimony of Mr. Hamblen in this connection is of great importance. Mr. Hamblen had, upon Roy Farley's request, kindly consented to go to the hospital and render what service he could, and of course he realized that, if Mr. Johnson was mentally competent and could express his testamentary wishes, Mr. Johnson had the right to execute a codicil to his will, and that it was the duty of a lawyer to assist him in carrying his desire into effect. All parties must have realized that Mr. Johnson was probably upon his death bed, and that the situation did not admit of delay. Under all the circumstances, the matter being doubtful, it was not Mr. Hamblen's duty to pass upon the question of whether or not Mr. Johnson enjoyed testamentary capacity; that was a question which could be settled later. The immediate problem was, if Mr. Johnson desired to execute a codicil to his will, to ascertain his wishes and embody them in a legal document which would carry them into effect. Mr. Hamblen performed his duty as a member of the bar, in a careful manner, and his acts were in all respects justified by the situation then presented to him. While it was unfortunate that Mr. Johnson's physician was not consulted, Mr. Hamblen acted upon the situation as it was presented to him.
Mr. Hamblen's testimony, as given before the court when the codicil was offered for probate, was read pursuant to the stipulation above referred to. He testified that he prepared the codicil under the circumstances above stated; that, in signing the same, Mr. Johnson's hand was guided by nurse Devitt, under instructions from the witness. Asked if Mr. Johnson declared the document to be a codicil to his last will and testament, the witness answered: "He indicated that it was. He didn't make any declaration to that effect." Asked if, when he executed the instrument, Mr. Johnson appeared to be of sound mind, the witness answered: "I can't answer that question, Mr. Fraser, without giving some of the details of the circumstances." Concerning Mr. Johnson's condition the witness testified: *Page 639 
"Mr. Johnson was unable to talk, but he made a very considerable effort to do so. Apparently he was partly paralyzed, but he was able to whisper, or more or less squeak, and he could make motions with one of his hands. He was able, as I had been told over the phone, to nod his head and shake his head.
"Shortly after I had gotten there in his room, questions were put to Mr. Johnson. Mr. Farley, as I recall it, started the questioning, asking him if he wished to make some change in his will. The response was by a nod of the head.
"The questioning proceeded along that line, being restricted, however, to land which Mr. Johnson was supposed to own in Grant county."
The witness illustrated the method of proceeding by testifying as follows:
"Then the question would be, `Do you wish to leave some of this land to your niece?' He would nod his head. `Do you wish to leave some of the land to your sister-in-law?' He would shake his head. `Do you wish to leave some of the land to your stepson?' The stepson was mentioned that evening. I have learned since that there was no stepson. The answer was made, however, he would shake his head. Then the question was, `Do you wish to leave some of it to Darrel Farley?' He nodded his head. `Do you wish to leave all of it to Darrel Farley?' He shook his head. `Do you wish to leave part of it to Darrel Farley, and part of it to your niece?' He nodded his head. All the time he was making an effort, also, to talk. He was making a very strenuous effort to express himself by word of mouth, but it was impossible for any of us, even for me, to understand. I couldn't get anything from him that way. I was taking notes on one of these pieces of paper during this inquiry, and it finally reached the point where we obtained consistent answers from him in reference to these five quarters of land; that he wished Darrel Farley to have two of the quarter sections and his niece to have three of the quarter sections. There was something else that he wanted, but we could not make it out."
The witness stated further that, after the codicil was written, the pen was handed to Mr. Johnson, but he was not able to sign his name, and that the witness then instructed nurse Devitt "that she should hold her hand over his hand, and help guide his hand in making the signature, *Page 640 
which she did." The necessary formal questions were propounded to the testator, who answered by affirmative nods of his head.
Mr. Hamblen further testified that, after he had been in the room a few moments, he was so impressed by the difficulty of communicating with Mr. Johnson "that we discussed the possibility of not trying to do anything that evening." The witness then testified:
"As we discussed the possibilities of that, Mr. Johnson, as I recall, indicated, partly by gesturing with his hand and partly by attempting to elevate himself on his elbow, that he was anxious, or at least concerned about something. My conclusion was that he was anxious to have something done then. As I recall it, we continued in our efforts to reduce this matter to a will, or to a codicil."
The following then occurred:
"Q. Mr. Hamblen, it was your honest belief that evening, when you attested this codicil, and from what you observed of Mr. Johnson and his responses, that he had that quantum of understanding which the law requires in order to be permitted to make a will?
"MR. FRASER: Will you repeat that question? (Question read.)
"THE WITNESS: I will answer that in this way, Mr. Munter: It was my personal belief that this codicil expressed his wishes that evening. Whether he had the quantum of understanding necessary, I don't know."
Dr. J.W.D. Lynch, a graduate physician and surgeon, specializing in brain surgery, who had practiced for ten or twelve years in Seattle and Spokane, testified that he was called to attend Mr. Johnson when the latter was admitted to the Spokane hospital. The doctor stated that Mr. Johnson had suffered a brain injury, commonly referred to as a "stroke," or apoplexy, and that when the witness first saw him, Mr. Johnson
". . . was completely paralyzed in the right side of the face on the lower side, his right arm, his right leg, and he was entirely unable to speak. He had, with this, a complete loss of the sense of reading, that is what we refer to as a hemianopsia, involving the right side of his visual field. We could test that by getting on his right side and making *Page 641 
motions, to see if he would make any attempt to respond to our fingers' coming toward his face, even with a blink of the eye, which is a reflex which is almost automatic. That hemianopsia involved half of his visual field. This gentleman had developed symptoms as a result of the stroke which, over a period of two or three days, had been progressive. Referring back to his lack of speech, that didn't develop until after the stroke had begun, which is medically pertinent. May I explain that? . . . Q. From your observation, state what would be the results of this. A. Of course, at the time I first saw him, the man had a complete aphasia. He was unable to speak, and he was completely paralyzed in the right side. This existed at the time that I first saw him, as well as a loss of the retention of the memory of the written word. He had what we call an alexia, as well as this visual defect. Q. What is alexia? A. That is the loss of memory of the written word. The patient cannot read words. Words do not mean anything to them. These symptoms were present when I first saw him."
The doctor testified that, when he first examined Mr. Johnson, the latter's physical condition was not bad; his blood pressure was low rather than high, and his heart action was quite good. The doctor then continued:
"The first day that he was there, he was taking fluids by mouth, but as time went on, he continued to deteriorate. As the hours went by, he would become less cooperative. We would offer him water, and he would not take it. He was restless, and he would indicate that he had a wish for something. He might want a drink of water, or he might want his position changed. We would ask him if he had a headache, and then he would shake his head in the affirmative. We would ask him if he was uncomfortable, and he would nod his head in the negative. As time went on, this continued, and became more than when he first came into the hospital, which is the type of insult that this man had to his brain."
As to the effect of the stroke upon Mr. Johnson, the doctor testified:
"Well, in this particular case his paralysis was a result of the plugging of an artery which supplies a large section of the left hemisphere of the brain, and the result of that *Page 642 
plugging is that the area of the brain which is deprived of its blood supply degenerates, and as a result of that deterioration and softening, there is a certain amount of edema of the brain, and an increase in the inter-cranial pressure."
After further testimony, the doctor stated:
"Q. Dr. Lynch, you indicated that his reaction to questions, when he would be asked something, might be the reverse of what he really wanted, or what he really needed? A. Yes, it was very contradictory. We would ask him if he wanted a drink of water, and he would indicate that he did. When we brought it to him, however, he would refuse it. We would ask him if he had a headache, and he would say that he did, but if we asked him if he was comfortable, he would say that he was. Q. When you say `we' who do you mean? A. The nurses and myself. We had to catheratize him, because we didn't know when he would want to urinate, unless by the indication of his restlessness. We would have him catheratized and draw out this urine, when he would appear to be more quiet and relieved for a while. As time went on, he would evacuate his bladder into the bed involuntarily. Q. In view of his condition, with which you were familiar, what would you say as to his capacity to understand business on August 21, 1942. A. In my opinion, he could not understand business. In my opinion, he had no mental conception sufficient to allow him to understand business transactions at that time. Q. Doctor, I wish to ask you this question: If, to have testamentary capacity, one must know his property, know the natural objects of his bounty, and understand the nature of the act of making a will, would you say that Mr. Johnson, on August 21, 1942, had testamentary capacity, knew the nature of his act, the writing of this codicil, and was capable of writing a codicil? A. I would say no. . . . Q. Dr. Lynch, to what extent would Mr. Johnson's disability prevent him from receiving impressions through spoken words addressed to him at that time? A. His mechanism of hearing would, naturally, be intact. The vibrations would reach the hearing mechanism and be conveyed to the brain. In my opinion, however, the condition of the brain was such that he would not understand properly things that were said to him, as the result of that injury to his brain. Q. How about his being able to comprehend the reading over to him of a document. A. He wouldn't comprehend it. He couldn't *Page 643 
comprehend it. You might read a legal paper to him, or you might read some passage from the Bible to him, but it would be all the same to him."
Nothing occurred during the lengthy cross-examination of the witness which weakens the effect of the testimony which he gave upon his examination in chief.
Dr. Alex Harell, a hospital interne who attended Mr. Johnson while he was in the hospital, testified that he frequently saw the patient, and that, so far as his observation went, Mr. Johnson was not able to speak, although the witness tried to talk with him. The witness testified to facts only, and did not state his opinions as a physician. To ascertain the patient's condition, the witness requested him to do certain things, to lift or turn his head, to raise his arm, etc., to none of which suggestions did the patient respond. In response to a question as to whether or not, in his opinion, Mr. Johnson was capable of carrying on a conversation by nodding or shaking his head, the witness answered: "He did not when I examined him." He also testified: "He didn't seem to be able to understand anything that I wanted him to do for me. That is all I can say."
Margaret Nordwall, one of Mr. Johnson's special nurses, testified that she had been a nurse for eleven years; that she cared for Mr. Johnson during the night shift; that from the time the patient entered the hospital he became gradually worse. She testified that she had attended probably fifty patients suffering from an affliction similar to that of Mr. Johnson, probably half of whom were approximately the same age as Mr. Johnson. She stated that the patient was unable to speak, that he would mutter and mumble, but that she could not understand what he was trying to say. In response to a question as to whether he would attempt to talk to her, she testified:
"A. Well, it was hard to tell. He would mutter and mumble by the hour. He didn't seem to expect an answer then, but sometimes he would get very restless and try to get out of bed, and of course, I had to make a guess at all the things I did for him. If I offered him a drink, sometimes he would drink and sometimes he wouldn't. Of *Page 644 
course, he was paralyzed on one side, but he would use the arm and leg on the opposite side and he would move them around, you know, swing them around and move them. Q. Was he able to hold receptacles in his hand? A. No, he wasn't. Q. In either hand? A. No."
The patient was very restless and, according to the doctor's orders, she administered sedatives. She also testified:
"Q. Miss Nordwall, what was your method and how did you succeed in learning his desires? A. Well, I never succeeded. I would make a guess at all the things I did for him. Q. You would what? A. I never succeeded. I would make a guess at everything I did for him. Q. Did you have this experience: That you would ask him if he wanted a drink, for instance, and then he would nod his head and later when you brought it he would refuse it? A. That is correct. Q. Have you had other experiences of a similar nature with reference to his treatment — something to drink or something or other? A. Well, of course, he would never be able to make us nurses know when he needed the urinal. He would usually wet the bed, unless we just accidently made a guess at that. That was one of the other things. I can't remember anything else."
Lucille Shorey, another of the nurses, testified that she cared for Mr. Johnson from seven a.m. to three p.m., having gone on duty at noon the day the patient reached the hospital. Concerning the patient's condition, she testified:
"Q. You had occasion to ask Mr. Johnson questions regarding his care? A. Yes, very often. Q. What was your experience as to his answering them? A. Well, sometimes he would say — he would nod his head yes, or he would nod his head no. It would be the same questions sometimes, that you would ask him, but he didn't give consecutive answers. If you asked him if he wanted a drink of water, if he didn't want it, he wouldn't take it. You could offer it to him when you asked him, and sometimes he would take it and sometimes he wouldn't. Q. Would the answers sometimes be irresponsive, or in the opposite of what you would expect, under the circumstances? A. Yes, I think they were."
On cross-examination, the following occurred:
"Q. Mrs. Shorey, from the questions that you asked Mr. Johnson in regard to his care there at the hospital, did he *Page 645 
answer consistently, and did he appear to know what he wanted and what he didn't want? A. Well, at times he knew what he wanted, but we never could understand what it was, I thought. Q. I am talking about just you yourself. A. Well, me, also. It was very difficult because of that reason, that we couldn't interpret what he wanted. Q. But he was trying to say or trying to gesture what it was? A. Yes, that is correct. Q. But when the proper question was propounded to him, or when the situation was demonstrable, as far as he was concerned, then his wishes were definite and consistent? A. Well, I cannot say that they were, because I didn't think that anything was definite. Q. Well, I understood you to say to me, in discussing this matter with you, that Mr. Johnson knew what he wanted very definitely but he had trouble in conveying it to you? Was that right or wrong? A. That is right, that he wanted something definitely, but none of us, me or anyone else, ever knew what it was."
Mrs. Margaret Devitt, who was the nurse present at the time of the execution of the codicil, testified at considerable length. She identified the codicil and her signature as a witness. She then testified:
"Q. Did he declare it to be the codicil to his last will and testament? A. To the best of our knowledge, that is what he wanted. Q. He made no declaration by word of mouth? A. No. Q. How did he indicate that it was his codicil? A. He was moving his head in a negative or affirmative manner. He would shake his head yes or no. Q. He was shaking his head yes, if that is what he wanted, and no, if that was not what he wanted? A. Yes. Q. He would indicate yes by a forward up and down motion, and he would indicate no by a lateral motion? A. Yes. Q. What was the motion in this case? A. I don't recall definitely. He seemed quite positive about that time, and had been going through quite a lot of motions. Q. Was a question propounded to him as to whether or not it was the codicil to his will? A. Yes, it was. Q. By whom was that question propounded? A. By Mr. Hamblen. Q. What did you say his reaction was? A. I would say his reaction was rather indefinite."
She later testified:
"Q. Would you say that, at the time he signed this, he was of sound mind? A. I don't believe he was. Q. Would *Page 646 
you say that he was free, or otherwise, from undue influence or duress, or anything like that, from any person at all? A. I don't know whether he was or not."
The witness testified that as a nurse, either general or special, she had cared for probably twenty-five old people suffering from stroke. On cross-examination, the witness testified that the fact that Mr. Johnson had executed a codicil to his will should have been noted on the chart. The following then occurred:
"Q. Why didn't you put it on the chart? Wasn't it because nothing occurred to you that this man didn't know what he was doing until Dr. Lynch talked to you a couple of days after his death, isn't that it? A. Yes, sir."
On redirect examination, she testified as follows:
"Q. Was there some discussion after this will had been written, between Mr. Farley, Mr. Hamblen, and yourself, as to whether or not this codicil would stand? A. Yes, sir. Q. What was that discussion? A. The patient didn't seem to be completely satisfied.
"MR. MUNTER: He asked you what the discussion was, not anything about the patient, unless the patient said or did something.
"BY MR. FRASER: Q. The condition of Mr. Johnson, after this codicil was executed, was one of impatience, or something indicating that he wasn't satisfied? A. For some time, yes. Q. Did that indicate to you that he wasn't satisfied with the instrument, or that there was some unfinished business to be done? A. I wouldn't know what he wanted. He didn't seem satisfied."
Roy Farley testified to his long friendship with Mr. Johnson, told of Mr. Johnson's arrival at Hartline, his illness there, and the trip to Spokane. He stated that he visited Mr. Johnson several times, and was with him at eight o'clock or a little after on the evening of August 21st. He testified that on that occasion Mr. Johnson endeavored to talk to him, but the witness could not understand him. Finally, he heard Mr. Johnson utter the name Darrel, to which the witness responded: "Did you say Darrel?" whereupon Mr. Johnson nodded his head in the affirmative. The witness asked many questions in an attempt to find *Page 647 
out what the sick man wanted. He stated that Mr. Johnson would hold up his fingers, five, then three or two. Finally, the witness asked, "Do you want to give Darrel something," stating that he thought it was possible that such was his wish, whereupon Mr. Johnson nodded in the affirmative. Attempts were made to reach several lawyers, but they were not available. Finally, Mr. Hamblen's name was chosen from the telephone book, and he responded, as above stated. The witness testified that after Mr. Hamblen's arrival events occurred as Mr. Hamblen narrated.
Darrel Farley testified to his long and intimate acquaintance with Mr. Johnson, and to the friendship which existed between them. He told of seeing Mr. Johnson when the latter arrived at Hartline, but his testimony was not pertinent to the matter of the codicil.
Dr. A.E. Lien, a physician and surgeon practicing in Spokane, testified as an expert witness for respondent. The witness was well qualified to testify as an expert concerning the facts in the case at bar. He stated that he had heard Mr. Hamblen's testimony, and that from that testimony it was his impression that the testator was competent. The witness also stated that he had heard Dr. Lynch's testimony, and that from that evidence it was his impression that the testator was competent. Later, on suggestion from counsel, the doctor stated that his answers gave his opinion rather than his impression. Referring to Mrs. Devitt's testimony, the witness stated that from that testimony it was his opinion that the testator was competent. On cross-examination the following occurred:
"Q. Doctor, you observed, of course, in the testimony of Dr. Lynch and of some of the others — I think Miss Nordwall and also Mrs. Devitt — that it very frequently happens in cases like that of Mr. Johnson's that the response to questions was the opposite of what the patient intended? A. You find that a great deal, Mr. Glasgow, in all people who are sick, really sick. Q. I am not asking you about that. I am asking you about this kind of people. A. Yes. Q. I want you to limit it to that. A. I heard that. Q. And what do you say about people suffering from paralytical strokes? A. They do that." *Page 648 
On redirect examination, the witness stated that the fact that Mr. Johnson's answers were inconsistent would not necessarily indicate any lack of competency.
Dr. Donald A. Palmer, an expert witness on behalf of appellant, testified by deposition. Dr. Palmer's qualifications were such as to enable him to testify as an expert as to Mr. Johnson's mental capacity. In anwer to a long hypothetical question, which fairly stated Mr. Johnson's condition while in the hospital, the witness stated that a person in such a condition was not mentally capacitated to execute any important document, such as a will or a codicil. The witness stated that a man in such a condition would not be capable of understanding any business transaction.
Theodore Rysdorf, a resident of Hartline, testified that he and Mr. Johnson were intimate friends of forty years standing; that, during the ten years before Mr. Johnson's death, the witness saw him nearly every time Mr. Johnson visited Hartline; that he met Mr. Johnson in Hartline a few days before August 18, 1942, and the two men conversed for from one to two hours; that Mr. Johnson stated that his health was poor, and that he did not expect to live long. He stated that Mr. Johnson said, during the conversation:
"I have got one satisfaction; that is, my estate and every thing is fixed and fixed the way I want it, so that I have got nothing to worry over."
This was within a very few days prior to the time Mr. Johnson suffered the stroke.
Isadore Smith testified that he had lived in Hartline most of the time since 1904, that he had known Mr. Johnson since that year, and that they were friendly. The witness stated that he met Mr. Johnson a few days prior to August 18, 1942, and that the matter of the estate of one McKinnon was brought up in the conversation, Mr. McKinnon's will having been successfully attacked. The witness then testified that he remarked:
"`Mr. Johnson, that is one thing that a man has to do, is to make a good competent will,' I says, `before he dies,' and he says, `I have got mine all fixed up.' He says, `Everything is all right. I have got my will made and everything, *Page 649 
so it is practically' — I didn't ask who he willed it to or anything; I just passed it by."
[2] Much other evidence was introduced, but we have discussed, at the expense of brevity, the material portions of the record. It is a recognized principle that the right to make a will is a valuable right. One who is in the possession of his mental faculties has the privilege of making testamentary disposition of his estate, and that privilege should be protected. It is also true that the right not to make a will is valuable, and that the right to have a will which has been regularly made stand and become effective at the testator's death is also a valuable right.
The following witnesses did not testify in person at the trial of the will contest: The testimony of Dr. Lynch, Mr. Hamblen, two of the three nurses, and Roy Farley, given at the hearing upon the application for probate of the codicil, was read to the court; the depositions of Dr. Harrel, Dr. Palmer, and nurse Nordwall, taken after the admission of the codicil to probate, were also read. Dr. Lien and Messrs. Rysdorf and Smith appeared at the hearing on the will contest, and testified in open court.
In the case at bar it appears that Mr. Johnson had, in 1937, made his will, which is drawn in considerable detail and indicates careful consideration. Mr. Johnson and the Farleys, father and son, were associated in business for many years, and were apparently quite friendly. This was true in 1937, as it was in 1942. Two entirely disinterested and credible witnesses testified that a few days before his last illness, Mr. Johnson talked about his will, and stated that he had arranged matters to his entire satisfaction. The doctor who attended Mr. Johnson in the Spokane hospital, an interne who frequently saw him, and the three nurses who attended him, all testified that in their opinion Mr. Johnson was mentally incompetent. Respondent calls attention to the testimony of nurse Devitt, in which she answered in the affirmative a question which indicated that she might have been influenced by something which Dr. Lynch had said to her. The witness was not asked to explain *Page 650 
this answer, and we are not convinced that by this answer the witness intended to contradict the testimony which she had previously given. Respondent argues that Dr. Lynch was prejudiced in the matter, but we find no indication of such prejudice in his testimony.
One thoroughly qualified physician testified, in answer to hypothetical questions, that in his opinion Mr. Johnson enjoyed testamentary capacity, while another equally well-qualified physician, under the same circumstances, gave his opinion that Mr. Johnson lacked such capacity.
Mr. Hamblen frankly stated that he did not know whether or not Mr. Johnson enjoyed testamentary capacity at the time the codicil was executed.
[3] The five professional persons who were associated with Mr. Johnson during his last illness, and who were best qualified to be able to testify as to his mental condition, united in stating that it was their considered opinion that Mr. Johnson, while a patient in the Spokane hospital, was mentally so weak as to be of incompetent mind. Dr. Lynch, the person best qualified to testify in this matter, was the most positive in his statements. No witness who saw Mr. Johnson while in the hospital testified that he possessed testamentary capacity. In making this statement, we are not unmindful of the fact, as we have stated above, that the burden rested upon appellant to establish the invalidity of the codicil.
The determination of the question of the presence or lack of testamentary capacity is frequently one of great difficulty. InIn re Cohen's Will, 106 Misc. Rep. 644, 176 N.Y. Supp. 689, the court very aptly observed:
"It may therefore fairly be said that it was a `deathbed will.' This raises no presumption against its validity [citing case], but it should lead to a more careful scrutiny than if executed by a person in full possession of bodily health and vigor and engaged in the normal pursuits of daily life."
In the case of Dean v. Jordan, 194 Wn. 661, 79 P.2d 331, this court said: *Page 651 
"The possession of testamentary capacity involves an understanding by the testator of the transaction in which he is engaged, a comprehension of the nature and extent of the property which is comprised in his estate, and a recollection of the natural objects of his bounty."
In cases where it appears that a will is rational on its face, and was executed in legal form, the presumption that it was the will of the testator, and that he possessed testamentary capacity to execute it, prevails. This presumption may be overcome only by clear, cogent, and convincing evidence.
[4] The testimony of the physician in attendance upon the testator is always accorded great weight. Richardson v. Moore,30 Wn. 406, 71 P. 18. The testimony of the doctor, the interne, and the three nurses is clear, definite, and factual. Dr. Lynch, the interne, and the nurses, all testified that Mr. Johnson was unable to communicate the simplest ideas, or to respond consistently and intelligently to simple questions. It is difficult to understand how a sick man who could not follow the simplest directions or communicate to those anxious to help him his elementary physical requirements could be able to formulate and communicate such a complicated scheme of disposing of a portion of his property as is embodied in the codicil in question. Outside of the testimony of Roy Farley, to the effect that he understood Mr. Johnson to murmur the name Darrel, there is not a word of evidence that Mr. Johnson did any more than agree or disagree, by moving his head, to suggestions made by others. Apparently the sick man wanted something, but, in our opinion, the record does not support the conclusion of the trial court in holding that the codicil which was admitted to probate embraced the testator's testamentary wishes. The witnesses who were present at the execution of the codicil all agree that Mr. Johnson was not satisfied with what had been done but wanted something else, but that they were unable to ascertain what he desired.
Respondent vigorously contends that, notwithstanding the fact that Mr. Hamblen in his testimony above quoted stated that he did not know whether at the time of the *Page 652 
execution of the codicil Mr. Johnson had the necessary quantum of understanding to render the codicil a valid testamentary act, Mr. Hamblen's acts in preparing the codicil and in witnessing the same must be considered as strong evidence in support of the testator's competency. In view of Mr. Hamblen's testimony and other undisputed facts disclosed by the record, respondent places undue weight upon this one phase of the evidence.
In will contests in which the question of testamentary capacity is raised, it is seldom that courts can determine the matter with certainty. In the case of Crum v. Crum, 231 Mo. 626,132 S.W. 1070, the supreme court of Missouri quoted the words of Lord Chancellor Cranworth, spoken before the House of Lords in 1857, in the case of Boyse v. Rossborough, 6 H. of L. Cas. [*] 45, as follows:
"`There is no difficulty in the case of a raving madman or of a driveling idiot, in saying that he is not a person capable of disposing of property. But between such an extreme case and that of a man of perfectly sound and vigorous understanding, there is every shade of intellect, every degree of mental capacity. There is no possibility of mistaking midnight for noon; but at what precise moment twilight becomes darkness is hard to determine.'"
Respondent strongly relies upon the opinion of this court Inre Chapin's Estate, 17 Wn.2d 196, 135 P.2d 445. The trial court in its memorandum opinion also referred to this case. The case is not in point here. While it appeared that the testatrix had suffered a stroke which greatly impaired her power of speech, she was always able to make her requirements clear to those in attendance upon her, and even was able to understand and discuss politics and current affairs with her friends and neighbors. At the time the will questioned in that case was made, the testatrix was far from being in the helpless condition of the testator in this case.
[5] Examination of the record convinces us that at the time of the execution of the codicil Mr. Johnson did not possess testamentary capacity. *Page 653 
The order of the trial court dismissing the contest is reversed, with instructions to sustain the contest.
SIMPSON, C.J., STEINERT, BLAKE, and JEFFERS, JJ., concur.